**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JESSIE FISHER**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 03-0566-WS-B** |
| | ) | |
| **CIBA SPECIALTY CHEMICALS** | ) | |
| **CORPORATION**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter comes before the Court on the following motions filed by defendants: Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Theodore Farber (doc. 500); Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Marco Kaltofen (doc. 501); and Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Richard Schuhmann (doc. 506).  The Motions have been fully briefed and are ripe for disposition.

**I.    Background.**

The case involves claims brought by five individual plaintiffs who own property in or around McIntosh, Alabama alleging diminution in value to their real estate caused by environmental contamination from a nearby chemical manufacturing facility (the "Ciba plant" or the "Ciba facility") that is or has been owned at various times by defendants.  Plaintiffs contend that their properties are contaminated by DDT emitted from Ciba's McIntosh plant.  Multiple summary judgment motions are pending, and this action is set for trial in the November 2007 civil term.

The three experts that plaintiffs have designated to testify on their behalf at trial are Dr. Theodore Farber (a toxicologist who will offer testimony concerning the regulatory history of DDT), Marco Kaltofen (a civil engineer who collected and analyzed household dust, soil and other samples from plaintiffs' properties and at other locations in the vicinity of the Ciba plant),

and Dr. Richard Schuhmann (an environmental engineer/consultant who has calculated certain contamination benchmarks for indoor dust at plaintiffs' property). Defendants have challenged the admissibility of all three proposed experts' testimony.

## II.    Legal Standard.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005).[1] In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). The Court's gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to lay the proper foundation to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Phillips v. American Honda Motor Co.*, 2007 WL 1892179, *2 (11th Cir. July 3, 2007) ("The proponent of expert testimony bears the burden of showing that the expert's methodology is reliable.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Maiz v. Virani*, 253 F.3d 641, 665

---

[1]    Rule 702 reads as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

-2-

(11th Cir. 2001) (similar).  That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization."  *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances of the particular case.  *Brown*, 415 F.3d at 1267-68.[2]  In performing a *Daubert* analysis, the Court's focus must be "solely on principles and methodology, not on the conclusions that they generate"; thus, it matters not whether the proposed expert testimony is scientifically correct, so long as it is shown to be reliable.  *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

Defendants have requested hearings on two of their three Motions.  Evidentiary hearings are not a mandatory condition precedent to determination of whether expert opinions are excludable under *Daubert*.  *See Corwin*, 475 F.3d at 1252 n.10 ("although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *Cook*, 402 F.3d at 1113 (noting that trial court was under no obligation to hold a *Daubert* hearing, although such hearings may be helpful in complicated cases involving multiple experts).  For the reasons set forth *infra*, the Court has determined that hearing would not be beneficial with respect to each of defendants' Motions.

## III.    Motion in Limine Concerning Dr. Farber.

According to the parties' Joint Pretrial Document, Dr. Theodore Farber, who has a Ph.D. in pharmacology, was retained by plaintiffs "to collect and summarize the regulatory record concerning the banning of DDT as a commercial product in the United States in the 1960s and

---

[2]    In applying these principles to the case at bar, the Court proceeds in recognition of appellate guidance that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert" or "because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct.").  Such circumstances may provide fertile ground for spirited cross-examination at trial, but they do not constitute a permissible basis for excluding testimony altogether under Rule 702 and *Daubert*.

1970s." (Doc. 534, at 42.) This function is echoed in Dr. Farber's report itself, which states that it "discusses the regulatory process and the regulatory history leading to the cancellation of this dangerous pesticide." (Motion in Limine (doc. 500), at Exh. A.) In his deposition, Dr. Farber explained that "[t]he only thing [he] was tasked to do here was to work up the regulatory history of the material, and ... generate[] general information in regards to toxicity and DDT." (Farber Dep., at 46.)[3] The record is thus exceedingly clear that Dr. Farber "was asked to develop a chronology in regards to the regulatory activities connected with DDT. That's it." (*Id.* at 52.)

Defendants' position is that Dr. Farber's report does not pass muster under Rule 702 because it is not opinion testimony that would "assist the trier of fact." In defendants' view, Dr. Farber "is not offering any opinions in this case" (Defendants' Brief, at 6) and lacks familiarity with many particulars of this case, such that his report cannot be of assistance to the trier of fact because "none of his testimony has any relation to any of the true issues involved" (*id.* at 7). According to defendants, "a summary of the regulatory history of DDT is not the sort of thing that requires expert testimony at the trial of this matter." (*Id.* at 9.)

The Court disagrees with defendants' conclusion that Dr. Farber's testimony and report are beyond the scope of Rule 702. As an initial matter, defendants' fixation on "opinions" and their characterization of Dr. Farber's testimony as not taking the form of opinions distorts the applicable standard. Rule 702 does not require expert testimony to be in the form of opinions; to the contrary, the Rule is written in terms of "scientific, technical or other specialized *knowledge*" (which Dr. Farber undoubtedly has) and testimony "in the form of an *opinion or otherwise*." Rule 702, Fed.R.Evid. (emphasis added). Therefore, whether or not Dr. Farber's expert testimony is properly couched as an opinion or a recitation of specialized knowledge is not

---

[3]     Rather than providing copies of official deposition transcripts in connection with their *Daubert* motions, defendants have filed what appear to be unformatted text file versions of the transcripts. At least one of these transcripts bears a clear notation that it is a draft transcript, not a certified transcript. (Doc. 501, at Exh. E.) The Court strongly suspects the same to be true of other deposition transcript excerpts submitted by defendants, which are clearly not in official form, are paginated in a confusing manner, and contain typographical errors befitting mere draft status. Although the Court will consider these documents in the manner that they were provided, defendants are reminded that discovery materials should be filed in their proper, official, certified form. Uncertified, draft deposition transcripts should not be filed in any proceeding in this District Court, and are subject to being stricken.

germane to the Rule 702 inquiry.

Nor does the Court find persuasive defendants' reasoning that Dr. Farber's testimony cannot be helpful to a jury for Rule 702 purposes unless Dr. Farber links his statements to ultimate issues of fact specific to the individual plaintiffs' situations and Ciba's alleged wrongdoing.  Contrary to defendants' crabbed reading of Rule 702, federal courts routinely allow expert witnesses to testify on background matters, divorced from the specifics of liability and damages in a particular case, as being helpful to the jury.  *See, e.g., United States v. Mulder*, 273 F.3d 91 (2nd Cir. 2001) (in Hobbs Act prosecution, expert testimony was admissible to explain the structure, goals, history and tactics of labor coalitions, and minority representation in construction trades); *United States v. Lewis*, 240 F.3d 866, 869-70 (10th Cir. 2001) (expert testimony was properly admitted to explain general requirements of Oklahoma law regarding commercial area hunting licenses, where expert offered no opinions as to whether that law applied to defendant); *United States v. Naegele*, 471 F. Supp.2d 152, 160 (D.D.C. 2007) (in prosecution for making material false statements in bankruptcy schedules, defendant could properly call witness who was expert in bankruptcy law and bankruptcy proceedings, to explain the Chapter 7 bankruptcy filing process generally, as such testimony would be helpful to a jury); *United States v. Pedroni*, 2002 WL 993573, (3rd Cir. Apr. 18, 2002) (in criminal action for tax evasion, district court did not abuse discretion in admitting expert testimony concerning tax structure as it pertained to motor fuel excise tax, where expert offered no opinions about defendant's part in alleged conspiracy).  A party is "free to offer expert testimony ... as background for an offense."  *Mulder*, 273 F.3d at 102 (district court properly admitted expert testimony that gave the jury background to enable them to understand how labor coalitions function).  This is precisely the purpose for which plaintiffs have offered Dr. Farber, and is entirely proper and appropriate.

As for defendants' contention that the regulatory history of DDT is not the sort of thing that requires expert testimony, it is an accurate statement of law that expert testimony is not admissible if "the expert could offer nothing beyond the understanding and experience of the average citizen."  *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  But surely defendants do not mean to suggest that the average layperson is familiar with the regulatory history and toxicity of DDT in the absence of expert testimony.  The undersigned learned a great

deal about DDT, its properties, and its history in this country by perusing Dr. Farber's report, and believes that the same would hold true for most jurors.  There can be no reasonable argument that Dr. Farber's testimony is not expert in nature and lies within the ken of the average juror.  Nor is it accurate for defendants to marginalize Dr. Farber's testimony as the stuff of a lawyer's closing argument.  To be sure, courts have rejected expert testimony in such circumstances.  *See, e.g., Cook*, 402 F.3d at 1111 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.") (citation omitted).  But that line of reasoning has no bearing here.  If plaintiffs' counsel stood up in closing argument and began telling the jury about the regulatory history of DDT, without having offered Dr. Farber as a witness first, defendants undoubtedly would object that this argument was improper because it lacked foundation and relied on facts not in evidence.  Dr. Farber's testimony is nothing like an attorney's closing argument, but rather lays predicate for the anticipated closing argument.  Defendants' contention to the contrary is unfounded.

In their reply brief, defendants abruptly switch gears, arguing for the first time that Dr. Farber's report should be barred because it "is replete with testimony regarding the applicable law relative to DDT," and constitutes inadmissible legal conclusions.  (Reply Brief (doc. 530), at 1-2.)  As the parties have previously been informed in this case, it is generally improper to raise new arguments for the first time in a reply brief.  It would be unfair and improper to consider these newly raised arguments at this time, when defendants could have raised them earlier and plaintiffs have not had an opportunity to be heard on them.  *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").[4]  The Court therefore declines to consider this objection.

---

[4]      *See also United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("the moving party in a motion cannot submit new information as part of its Reply"); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F. Supp. 1511, 1515 (S.D. Fla. 1996) ("the Court finds that the movant may not raise new arguments in a reply brief").

The bottom line is this:  In order to be admissible, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Henderson*, 409 F.3d at 1302. None of the infirmities ascribed by defendants to Dr. Farber's testimony obscure the fundamental point that he will impart knowledge that will help jurors understand the evidence in this case.  This action is about DDT contamination.  There is a clear, obvious benefit to jurors receiving information concerning what DDT is, its toxicity, and what steps the government has taken to regulate DDT in order to understand the implications of DDT storage, production and discharge by defendants during the time period of concern, as well as to understand the possible sources and effects of DDT contamination on plaintiffs' properties.[5]  In simple terms, the purpose of Dr. Farber's testimony is to help the jury understand what all the fuss is about with respect to any DDT found on plaintiffs' property.  How else is a jury to receive this potentially important background information, if not through expert testimony?  On that basis, the Court concludes that Dr. Farber's expert testimony is properly admissible pursuant to Rule 702.[6]

## IV.    Motion in Limine Concerning Kaltofen.

Next, defendants submit a Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Marco Kaltofen (doc. 501).  Kaltofen was retained by plaintiffs to perform sampling for DDT contamination in and around McIntosh, and to evaluate sources of any

---

[5]      An example of the obvious relevance of this testimony is found in Kaltofen's deposition, wherein defense counsel explored a line of questioning concerning the historical availability of DDT in the United States at different times for different uses.  (Kaltofen Dep., at 137-39.)  Kaltofen did not know all the answers, which is hardly surprising because he does not purport to be an expert in the regulatory history of DDT.  But the questions posited by defense counsel call for relevant background information, and plaintiffs can call Dr. Farber as an expert witness to provide this helpful context to the jury.

[6]      This conclusion echoes in both result and rationale that reached last year when defendants raised a substantially similar objection to Dr. Farber's testimony at the class certification stage.  At that time, the Court wrote as follows: "Dr. Farber's report provides a detailed discussion of the history and properties of DDT, revealing information that the Court has found nowhere else in the voluminous class certification record. Such information may not be of crucial importance to a Rule 23 analysis, but it is unquestionably useful background data that has enhanced and enriched the undersigned's understanding of the primary chemical compound of interest in this lawsuit."  *Fisher*, 238 F.R.D. at 280.  Just as bad jokes do not get better with the retelling, neither did defendants' objection improve in the re-litigating.

observed DDT contamination (so-called "fate and transport" opinions).  (*See* doc. 534, at 42.)
Defendants' Motion maintains that Kaltofen's opinions, reports and testimony should be
excluded in their entirety under Rule 702 because his "theories are completely speculative" and
"not reliable."  (Doc. 501, at 1.)  In their accompanying Memorandum, defendants elaborate on
their objections by assigning the following defects to Kaltofen's testimony: (1) he is not
qualified to offer expert opinions on fate and transport; (2) his opinions are based upon
conclusory and speculative assumptions rather than scientifically valid methodologies; and (3)
his report is clogged with discussion of irrelevant material.[7]  Each of these objections will be
considered in turn.

> ### A.    Objection to Qualifications.

First, defendants balk that Kaltofen's credentials are "insufficient to qualify him to opine,
even generally, on the highly scientific and technical issues of fate and transport."  (Defendants'
Brief (doc. 501), at 7.)  The facts are otherwise.[8]  Review of Kaltofen's qualifications confirms

---

[7]     Defendants request an evidentiary hearing on their Motion, at which they would
proffer the expert testimony of their environmental engineer, Dr. David Langseth, as well as
their air modeling expert.  Plaintiffs would presumably present live testimony from Kaltofen at
such a hearing.  At the two-day Rule 23 hearing in this matter conducted on April 25 and 26,
2006, the Court heard extensive live testimony from Kaltofen and Dr. Langseth concerning their
respective opinions.  Kaltofen was subjected to lengthy cross-examination from defense counsel
about alleged infirmities in his methodologies and qualifications, and Dr. Langseth testified as to
his areas of disagreement with Kaltofen.  The Court is also familiar with air modeling based on
review of Dr. Zannetti's expert report, as well as live testimony on that subject by another expert
at a Rule 23 hearing in a related action.  *See LaBauve v. Olin*, 231 F.R.D. 632, 648-49 (S.D. Ala.
2005).  Further, the Court has carefully reviewed the lengthy written submissions by both sides
in connection with this *Daubert* motion.  Based on all of the foregoing, the Court has a clear
understanding of the nature of Kaltofen's proposed opinions and testimony, as well as the
defects ascribed by defendants.  Under these circumstances, the Court is of the opinion that a
*Daubert* hearing would be inefficient, duplicative and largely unhelpful in resolving the issues
presented in defendants' Motion in Limine.  On that basis, the Court **denies** defendants' request
for a hearing.  *See generally Corwin*, 475 F.3d at 1252 n.10 (recognizing that *Daubert* hearings,
while often helpful, are not a prerequisite to determinations of whether to admit or exclude
proposed expert testimony).

[8]     Tellingly, defendants do not point to record evidence concerning Kaltofen's
qualifications, nor do they explain their contention that his qualifications are lacking.  At most,
defendants state in conclusory terms that Kaltofen's "qualifications are limited to chemical

that he has expertise in the fate and transport of environmental contaminants.  In an Affidavit submitted with plaintiffs' opposition brief, Kaltofen explains that he personally has "over 20 years of experience involving environmentally related fate and transport evaluations," that he has regularly performed fate and transport investigation services in both litigation and non-litigation contexts, and that he has been "repeatedly qualified to render expert opinions after being challenged under *Daubert* in both State and Federal courts in the fields of chemical fate and transport, chemistry and civil engineering."  (Kaltofen Aff. (doc. 525, Exh. 1), at 1-3.)  For example, Kaltofen has conducted a site investigation at a landfill in Texas and determined the environmental fate of materials released from that landfill after initial placement.  He has conducted site investigations in Massachusetts involving remediation and assessment of leaking underground storage tanks and buried hazardous wastes.  (*Id.*)  He has reviewed multiple Superfund sites and studied human and ecological exposure vectors.  (*Id.*)  Based on this and other uncontroverted evidence of Kaltofen's well-traveled career in environmental engineering as it relates to the study, assessment and remediation of environmental contaminants, it is clear that he is qualified to offer expert opinions concerning environmental fate and transport of the

---

sampling and then identifying chemicals," without identifying any evidence or testimony that circumscribes his expertise in this fashion.  (Defendants' Brief, at 7.)  They note that Kaltofen does not have a master's or doctorate degree, but do not explain either factually or legally why such graduate degrees are an essential prerequisite to fate and transport expertise, much less account for his 28 credit hours of graduate study in environmental engineering.  They protest that Kaltofen is not qualified to prepare an air dispersion model, but negate that conclusory statement by acknowledging that he has done no such modeling here.  (Reply Brief (doc. 532), at 3.)  Whether Kaltofen has expertise to perform modeling that he did not perform is a meaningless inquiry.  They state in conclusory terms that Kaltofen is not qualified to testify "regarding groundwater issues," without stating any record basis for that argument.  (*Id.*)  They insist that Kaltofen "is not an expert in waste disposal or compliance with environmental regulations" (*id.*), but overstate Kaltofen's opinion, which was simply that DDTr contamination immediately downstream of Ciba's facility is indicative of poor waste management processes at that facility.  Stated in that context, Kaltofen's waste management remark is fully aligned to his expertise.  He did not inspect Ciba's waste management practices and pass judgment on their sufficiency, but instead simply observed that high levels of contamination nearby are symptomatic of poor waste disposal practices.

contaminants of concern in this case.[9]

### B.    Objection to Methodology.

Second, defendants frame Kaltofen's expert conclusions as mere *ipse dixit*, unsupported subjective opinions grounded in speculation rather than science.  It is a well-established principle that expert testimony should be disallowed where "there is simply too great an analytical gap between the data and the opinion proffered."  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) (citation omitted).  In that regard, case law is quite clear that expert opinions are properly excluded if they are "imprecise and unscientific, or [if their] factual basis is not adequately explained."  *Cook*, 402 F.3d at 1111 (citation omitted); *see also Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (explaining that *Daubert* condemns expert testimony amounting to a scientifically unsupported "leap of faith"); *Michigan Millers*

---

[9]      The flimsiness of defendants' challenge to Kaltofen's qualifications is made plain in their Reply Brief.  Rather than rebutting Kaltofen's statements in his Affidavit chronicling his qualifications in detail, defendants assert that the Affidavit must be stricken because it is not notarized and because it is a mere "sham" that improperly supplements Kaltofen's expert report.  (Reply Brief, at 2.)  Neither objection has merit.  Close inspection of the Affidavit reveals that it is in substantial compliance with all of the elements of 28 U.S.C. § 1746 for an unsworn declaration.  As such, it is properly considered to the same extent that an affidavit would be.  *See, e.g., PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp.2d 1213, 1217 n.1 (S.D. Fla. 2004) ("unsworn declarations which are in writing and which are subscribed by the declarant as true under penalty of perjury, and dated can be treated with like force and effect as sworn declarations and affidavits") (citation omitted).  While plaintiffs properly should have styled this filing as a Declaration rather than an Affidavit, this non-material mix-up in nomenclature is hardly valid grounds for striking the Affidavit altogether.  As for defendants' secondary argument that the Affidavit constitutes an improper attempt to supplement Kaltofen's expert report, defendants offer no evidence of improper supplementation.  Instead, defendants state in the vaguest of terms that the Affidavit should be stricken "[t]o the extent [it] presents any new information about Mr. Kaltofen's expert opinions," without identifying any new information that was presented therein.  (Reply Brief, at 2.)  If defendants contend that the Affidavit offers new opinions, then it is incumbent on them to identify them.  They have not done so, but instead rest on their conclusory accusation.  To make matters worse, in the very next paragraph, defendants reverse course by asserting that "the affidavit merely reiterates the same conclusions" (*id.*) that Kaltofen has offered previously, which is seemingly irreconcilable with their argument just two sentences earlier that the Affidavit improperly supplements Kaltofen's expert report.  In any event, defendants having identified no basis for concluding that the Kaltofen Affidavit is a sham or otherwise improper, that document will be afforded full consideration for purposes of the Motion in Limine.  Defendants' request to strike the Kaltofen Affidavit is **denied**.

*Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted); *Pell v. E.I. DuPont De Nemours & Co.*, 231 F.R.D. 186, 192 (D. Del. 2005) (mere personal belief of expert witness as to weight of the evidence is properly excluded).

Defendants' characterization of Kaltofen's opinions as mere subjective beliefs is one-sided and unfair. At the heart of defendants' objections to Kaltofen's methodology is his failure to derive quantitative proof (via air modeling or other technique) establishing the existence of a specific pathway linking DDT emissions from the Ciba facility to contamination on plaintiffs' property. Certainly, that is one way plaintiffs could have proceeded in this case. An air model could have been done (as these same plaintiffs' counsel did in a related action in this Court) in an attempt to quantify DDT deposition in the surrounding community caused by activities at the Ciba facility.[10] By comparing modeled concentrations and depositions of DDT with known background levels, some quantification of cause and effect could have been achieved. (Zannetti Report (doc. 501, Exh. C), at 21.) Indeed, in the words of defendants' air modeling expert, Dr. Paulo Zannetti, "a well-performed air modeling exercise would give *unambiguous and quantitative results*," while the type of deductive analysis performed by Kaltofen is necessarily

_____

[10]     As explained by defendants' air modeling expert, this task would involve recreating approximations of air and soil concentrations of DDT in McIntosh using data on wind speed precipitation rates, soil moisture and the like to model the air dispersion and deposition of DDT from the Ciba facility over time. (Zannetti Report (doc. 501, Exh. C), at 20.) A necessary component of that analysis, however, would have been "development of an emission inventory" to "account for the amount of DDT that Ciba disposed of," among other factors. (*Id.*) Defendants' expert does not identify a data source that would provide any reasonable estimate of that figure, on which the entire air modeling exercise would have hinged, and the Court is aware of none in its perusal of file materials. In the absence of a reasonable estimate for DDT disposal amounts, the air modeling exercise might give "unambiguous and quantitative results," as Dr. Zannetti suggests, but it would also give meaningless results because it would be based on inadequate and speculative underlying data. (The Court has not seen and is not aware of Dr. Zannetti performing an air model on defendants' behalf in this case. If he has, then perhaps he has devised a solution to this quandary.) The apparent data limitations as to the amounts of DDT disposed of or emitted by the Ciba facility may well have influenced plaintiffs' decision not to perform an air modeling exercise in this case.

"circumstantial and qualitative in nature."  (*Id.*)[11]  Notwithstanding Dr. Zannetti's (and apparently defendants') preference for quantitative results, it is simply not true that quantitative scientific evidence is the only way to establish causation in an environmental contamination case, or that the inferential methodology employed by Kaltofen is inherently unreliable because it is circumstantial.  There is more than one way to skin a cat.  That Kaltofen adopted an inferential analysis of causality based on underlying facts and data does not automatically render it scientifically invalid.  Defendants have made no showing to establish their "one-size-fits-all" approach to proof of contamination sources.

To understand this point, it is helpful to review exactly what Kaltofen did in this case. Rather than proving up an actual, specific pathway (air, surface water, groundwater, etc.), Kaltofen's approach was, *inter alia*, the following:  to conduct sampling of soil, house dust and other media in the McIntosh community; to test those samples for the presence of DDT and its metabolites (often referred to collectively as DDTr); to compare the detection rates for DDTr in McIntosh to those in other communities without known DDT sources; to compare the concentrations of DDTr in McIntosh to those in other communities; and to map the test results for his and others' sampling in the community in the form of a concentration gradient to determine whether any clear spatial patterns emerge as one moves away from the Ciba facility. Based on his analysis of the aforementioned data, record evidence concerning the massive quantities of DDT produced at that facility, the relative paucity of agricultural use of DDT in that area, generally accepted scientific principles regarding the mobility of DDT via atmospheric dispersion (air, surface water, groundwater, fish/human activities), and the lack of other known

---

[11]     Although defendants tout the efficacy of an air dispersion model to prove causation, the Court's experience is that such modeling may provide negligible benefit in a specific case.  Aside from the assumptions inherent in the data on which the model rests, the results of such modeling may be plagued by high uncertainty rates on the order of 500% or more (such that the model's predictions may have precious little correlation with actual DDT deposition levels at a particular location) and necessarily do not account for such exogenous factors as human activities over the last 40+ years that may have disturbed any DDT deposits or altered, alleviated or exacerbated the conditions at particular locations.  *See generally LaBauve*, 231 F.R.D. at 648-49.  In light of these glaring drawbacks, no doubt defendants would have attempted to pick apart any air model performed by plaintiffs in this case.  It appears, then, that defendants fault Kaltofen for not constructing a straw man for them to torch.

major sources of DDT in the area, Kaltofen concluded that the Ciba facility was the major source of DDTr contamination found in the McIntosh community today.

The above-described methodology has all the necessary earmarks of reliability required by Rule 702.[12]  Kaltofen collected and analyzed dozens of samples to ascertain DDT concentrations in the McIntosh area.  He examined the resulting data (and other data sets) for spatial patterns in DDT concentrations in relation to the Ciba facility.[13]  Based on his analysis, Kaltofen concluded that "there is a clear concentration gradient moving away from the Ciba-Geigy site." (Kaltofen Aff., at 4.)  Kaltofen also cited data showing that detection rates and concentration levels of DDTr in household dusts in McIntosh are much higher than those in areas with no known DDT sources, which would tend to suggest that the elevated DDTr levels found in McIntosh homes emanate not from household use or general background levels but from a known, large-scale DDT source, and the only such source in McIntosh is the Ciba facility.  (*Id.* at 3-4.)  Thus, after performing these procedures, Kaltofen's opinion is that the Ciba facility is the source of the elevated DDTr levels in McIntosh.

The obvious, logical follow-up question is: How did the DDT get from the Ciba facility to homes in the surrounding community?  While defendants fault him for not answering this question with more precision, Kaltofen properly relied on his expertise by outlining all of the different pathways through which DDTr might have been transported from Ciba property to homes of McIntosh residents.  Kaltofen's reasoning goes something like this: (a) we know that Ciba emitted DDTr, because there are high concentrations of DDTr in the floodplain and Tombigbee River just downstream from the Ciba site; (b) once released, DDTr travels through atmospheric dispersion, and may be mobilized worldwide, which would allow it to infiltrate the

---

[12]     *Daubert* and its progeny often recite a four-factor test for assessing reliability, including whether the theory can be tested, whether it has been subjected to peer review, the known or potential rate of error, and its general acceptance in the scientific community.  *See, e.g., Allison*, 184 F.3d at 1312.  But the parties have generally eschewed analysis of those factors here, which is appropriate given the specific circumstances and the emphasis in the case law that these factors are "a mere starting point" for the analysis.  *Id.*

[13]     Defendants' expert, Dr. David Langseth, while sharply critical of Kaltofen's conclusions, performed a similar spatial analysis.

McIntosh community; and (c) we know that the DDTr on plaintiffs' properties came from Ciba because alternative sources can be ruled out.  (*Id.* at 3-4.)

Defendants articulate numerous criticisms of Kaltofen's methodology, analysis and conclusions.  In support of their position, defendants enlist their corresponding expert, Dr. Langseth, who opines that Kaltofen's work is deeply flawed.  Most of these challenges can be swept aside without further comment, as they are matters that are properly raised on cross-examination or via conflicting expert testimony, rather than grounds for excluding Kaltofen's expert opinions altogether.[14]  Several of defendants' objections warrant brief treatment herein, however.  On pages 7 and 9 of their brief, defendants maintain that Kaltofen's report is mere *ipse dixit* unsupported by any scientific methodology or analysis.  As shown by the foregoing, this characterization is demonstrably inaccurate.  Kaltofen is not testifying that Ciba is the source of the DDTr in the community because he says it is.  Rather than asking the jury to take his word for it, Kaltofen is opining that Ciba is the source because his analysis and the record evidence on which it relies reflect that (i) concentrations are highest at the Ciba facility, then decline as one moves away, (ii) concentrations and detection rates are much higher in McIntosh than in other communities with no known DDT source, (iii) the Ciba facility was a massive producer of DDT that dwarfed other sources of DDT in the area, (iv) other causes have been ruled out, (v) data from tests near the Ciba site demonstrate that DDT was emitted from the plant, and (vi) once emitted, DDT mobilizes through various pathways that could disperse it through the McIntosh community.  Whatever flaws it may have, this reasoning cannot reasonably be characterized as mere *ipse dixit.*

---

[14]      By way of example, defendants and Dr. Langseth take Kaltofen to task for including samples from Ciba property in developing his concentration gradient, for ignoring communities with higher detection rates than McIntosh and no known DDT source, for lowering detection threshold limits to artificially boost his detection rate numbers, for intentionally engaging in biased sampling (rather than random sampling), for including sampling points that he should have excluded, and the like.  All of these issues may well yield an effective cross-examination at trial, but they are not a valid basis for excluding Kaltofen's testimony altogether.  To hold otherwise would be to interpret Rule 702 as obliging a district court to pick and choose between dueling experts in pretrial motions, and to allow only the victor to testify at trial.  Such an approach would expand *Daubert* far beyond its present scope, and vastly exceed the undersigned's gatekeeper responsibilities.

Nor is it accurate for defendants to state that Kaltofen refuses to consider the possibility of agricultural sources of DDT. To the contrary, Kaltofen readily acknowledged the legacy of agricultural use of DDT in McIntosh, but opined that, "in reviewing the data that we have, it is orders of magnitude below what we see from Ciba-Geigy and its contribution." (Kaltofen Dep., at 128-29.) When pressed further, Kaltofen acknowledged that there might be some individual pesticide use, which he expected to be rare because many of those products had been deregistered, and stated, "as far as I know, there are no other major generators, emitters, disposers of organochlorine pesticides in McIntosh - the McIntosh area." (*Id.* at 129.) Kaltofen discounted agricultural use as a significant source of the DDT contamination he found in the community because (a) "looking at the actual figures of use, it is several orders of magnitude smaller than Ciba's production levels,"(b) "in looking at agricultural soil samples, our levels are nondetect," which would not be expected had DDT been applied by farmers tilling those soils, and (c) "concentrations of DDT in home dusts in McIntosh [are] dramatically higher than these other locations, which are presumably subject to exactly the same other factors" other than proximity to the Ciba plant. (*Id.* at 131, 245.) Defendants may disagree with Kaltofen's conclusions and reasoning, but they cannot reasonably dispute that he went beyond merely dismissing with sleight of hand other potential sources of the DDTr in McIntosh.

In their Reply Brief, defendants protest that Kaltofen has never given a "simple step-by-step explanation of how and when the DDT arrived at the Plaintiffs' properties." (Reply Brief (doc. 532), at 4.) But the premise of defendants' argument demands that Kaltofen provide a degree of precision that is likely a scientific impossibility in this case. There is no simple step-by-step explanation because this is not a simple step-by-step case. We are dealing with alleged environmental contamination based on activities that may have occurred a half century ago. These are complex systems and complex pathways, with multiple potential sources, all veiled and obscured by the sands of time in the intervening passage of a half century. The Court strongly doubts that any scientist could definitively testify that a particular granule of DDT contamination arrived on plaintiff X's property on a particular day in a particular quantity via a particular mechanism. Defendants' much-ballyhooed air dispersion model would not provide that information. Plaintiffs do not have to provide such a staggering quantum of proof to prevail at trial. More to the point, *Daubert* does not require scientists to be endowed with superpowers.

-15-

Kaltofen has offered an inferential, scientific methodology that creates, analyzes and identifies trends in data (much of which he himself collected and produced); considers and rules out alternative sources; points to evidence that Ciba emitted DDTr; explains the various mechanisms through which Ciba-emitted contamination could have reached plaintiffs' property; and concludes that the contamination on plaintiffs' property originated from the Ciba plant. That is sufficient to satisfy *Daubert*'s reliability standard.

### C. Objection to Inclusion of Irrelevant Material.

Third, defendants object to the inclusion in Kaltofen's report of matters that defendants view as "totally unrelated to these five Plaintiffs." (Defendants' Brief, at 15.) The law is clear that "when an expert's data is not directly relevant to the matter at issue in a case, the expert's testimony does not assist the trier of fact and is therefore inadmissible under *Daubert*." *Phillips*, 2007 WL 1892179, at *3 n.2; *see also Allison*, 184 F.3d at 1312 (expert testimony "must have a valid scientific connection to the disputed facts in the case" to be admissible).

In this regard, defendants point to Kaltofen's testimony concerning groundwater, surface water, fish advisories and the like. As Kaltofen explains, however, these facts are not irrelevant, notwithstanding the fact that plaintiffs are not claiming that their groundwater is contaminated, that they ate DDT-laced fish, or that contaminated surface waters flow on their property. Kaltofen's point in reciting this data is to show that Ciba emitted DDT (as demonstrated by evidence of contamination in close proximity to the plant) and that, once emitted, DDT travels via a variety of pathways into the environment. If Ciba contaminated groundwater with DDT, then a reasonable inference can be drawn that Ciba was not taking adequate measures to prevent the emission of DDT. If Ciba was emitting DDT, then atmospheric dispersion could bring that DDT to plaintiffs' property. While these linkages have not been enunciated or developed in the materials before the undersigned with as much clarity as they perhaps could and should have been, the Court finds that these sorts of ancillary facts are not so lacking in relevance that they should be excluded, much less that they form a valid basis for striking Kaltofen's report in toto.[15]

---

[15] The same result applies to defendants' objection to Kaltofen's consideration of DDTr in samples taken at the Ciba plant, as opposed to off-site readings. There is a fundamental disagreement between Kaltofen and Dr. Langseth as to the propriety of using on-site measurements in the preparation of a concentration gradient. That disagreement is best resolved

### D.   Conclusion.

At least in part, defendants take umbrage at Kaltofen's report because they deem it "a collection of factoids and conclusions with no cohesion," hampered by "illogical nonsequitors [*sic*] and jumbled reasoning."  (Defendants' Brief, at 15; Reply Brief, at 6.)  Defendants' briefs have persuasively catalogued problematic aspects of Kaltofen's report and opinions.  Based on these considerations, a jury may or may not agree with or accept his opinions.  But the Court finds that Kaltofen's proposed opinions satisfy Rule 702, inasmuch as he is qualified to testify competently regarding these matters, his methodology is sufficiently reliable, and the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  Defendants' concerns are fodder for what promises to be a robust cross-examination and a full-scale counterattack by defendants' experts, but the Court cannot agree with defendants' position that Kaltofen's opinions are so flawed that they will unfairly mislead and confuse the jury.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence."  *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (citation omitted).  Defendants' interests are fully protected by those procedural safeguards; therefore, the Court will not exclude Kaltofen as a witness in this case pursuant to *Daubert* principles.

### V.   Motion in Limine Concerning Dr. Schuhmann.

Defendants' third and final *Daubert* Motion seeks to exclude the testimony and opinions of Dr. Richard Schuhmann, an environmental engineer retained by plaintiffs.[16]  In his words, Dr.

---

by the jury after hearing from both experts at trial.  *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citing with approval authority for the proposition that district court performing *Daubert* gatekeeping role must not evaluate credibility of opposing experts and persuasiveness of competing scientific studies, which would conflate questions of admissibility with questions of weight to be given testimony).

[16]    In briefing this Motion, neither side initially submitted a copy of Dr. Schuhmann's expert report.  Because it was difficult to discern from the parties' submissions precisely what he had done and what conclusions he had reached, the undersigned entered an Order (doc. 541) directing plaintiffs to supplement the record with a copy of that report. Plaintiffs complied (see doc. 542), and Dr. Schuhmann's report will be considered in resolving

Schuhmann was asked by plaintiffs "to develop indoor health-based benchmarks (clearance criteria) for select contaminants in settled dust ... so that these benchmarks could be used to assess the need for clean-up/remediation of the homes identified by counsel for plaintiffs." (Schuhmann Aff. (doc. 524, at Exh. A), at 1.)  As the Court understands it, Dr. Schuhmann calculated threshold levels of DDT, DDD and DDE contamination for each of three plaintiffs (Barbara Byrd, Jessie Fisher and Ronald McIntyre) that represent plaintiff-specific clean-up goals for each of them.  In other words, to the extent the contamination of settled indoor dusts in the homes of Byrd, Fisher or McIntyre today exceeds Dr. Schuhmann's individual-specific benchmarks, clean-up to the level of the benchmark is necessary to prevent excess health risk. (Schuhmann Report (doc. 542), at 6.)  Defendants maintain that Dr. Schuhmann lacks the qualifications and expertise to perform a risk assessment, that his opinions are scientifically unreliable because he misapplies his methodology to the circumstances of this case, and that his opinions are irrelevant.[17]

### A. Objections to Relevance of Dr. Schuhmann's Opinions.

Among defendants' objections is their contention that Dr. Schuhmann's opinions cannot assist the trier of fact because this is a property damage case, while his opinions relate to risks of personal injuries.  Although defendants posit this objection last, it is the most logical starting place to the analysis.  If Dr. Schuhmann's opinions are not relevant to the issues joined in these

---

the *Daubert* issues litigated herein.

[17]   After careful review of the voluminous materials submitted by the parties concerning Dr. Schuhmann's testimony, defendants' request for an evidentiary hearing is **denied**.  In addition to setting forth their respective legal arguments in great detail, the parties' submissions include excerpts from the expert report of defendants' counter-expert, Dr. Elizabeth Anderson, excerpts from the depositions of both Dr. Anderson and Dr. Schuhmann, and lengthy affidavits from both experts in which they critique each other's opinions and offer rejoinders of each other's critiques.  Furthermore, the Court's understanding of Dr. Schuhmann's opinions and methodology for *Daubert* purposes is aided considerably by review of both his entire 94-page report (inclusive of exhibits) and plaintiffs' filing of a whopping 30-page, single-spaced Affidavit from Dr. Schuhmann.  On this highly developed record, the Court has a firm grasp of the opinions of both Dr. Schuhmann and Dr. Anderson, as well as the parties' respective positions on the legal and factual issues involved.  To conduct a *Daubert* hearing under these circumstances would be unhelpful, inefficient, and redundant of the parties' submission of more than 200 pages of affidavits, testimony, reports, and arguments concerning these issues.

proceedings, then that threshold determination moots the parties' disagreements concerning his qualifications to offer such opinions and the reliability of the methodology he employed in deriving those opinions.

Dr. Schuhmann attempts to quantify the present-day household contaminant levels that would trigger an excess risk of cancer for several plaintiffs, given their exposure histories, arising from alleged DDT contamination by Ciba on their properties. There is, of course, no question that plaintiffs' claims in this action are restricted to claims of property damage, and do not encompass claims of personal injury, health risks, or medical monitoring.[18]  Defendants argue in conclusory terms that Dr. Schuhmann's computations "have no bearing on the value of the property owned by Plaintiffs." (Reply Brief (doc. 531), at 3.)[19]  However, simply because Dr. Schuhmann does not directly evaluate the existence and degree of devaluation of plaintiffs' property does not render his testimony irrelevant to that question. By comparing observed DDTr levels on each plaintiff's property to the health-based benchmarks computed by Dr. Schuhmann, a finder of fact could reasonably infer whether and to what extent DDTr remediation at that location is necessary to prevent an elevated risk of cancer for plaintiffs. That sheds light on property damage issues. Such a comparison would also aid the jury in assessing plaintiffs' claims that defendants' contamination of their property "has caused substantial damage or inconvenienced them as to the use and enjoyment of their properties," which defendants concede are issues joined in these proceedings. (Pretrial Document (doc. 534), at 9.) Stated differently,

---

[18]     Indeed, in the parties' joint proposed Pretrial Document (doc. 534), submitted on July 12, 2007, plaintiffs commenced their Statement of the Case with the words "This is a property damage case." (Doc. 534, at 2.) Defendants' concurrence with this characterization is set forth in their Statement of the Case, wherein they write, "Plaintiffs seek damages for alleged injury to their properties only. They have expressly disavowed any claims related to personal injury or health." (*Id.* at 4.)

[19]     At most, defendants repeatedly cite page 157 of Dr. Schuhmann's deposition transcript for the proposition that he was offering no opinions as to plaintiffs' property values. (Defendants' Brief, at 16; Reply Brief, at 3.) But page 157 as appended to defendants' brief as Exhibit A contains no such statements, but instead mentions inhalation rates and whether Dr. Schuhmann considered plaintiffs' specific exposure frequencies in performing his computations; therefore, defendants have failed to offer evidence to support their characterization of Dr. Schuhmann's testimony on this point.

if the jury were to accept Dr. Schuhmann's benchmarks and determine that those benchmarks are exceeded by DDTr readings at plaintiffs' homes, the jury could find that plaintiffs have an elevated risk of contracting cancer because of their exposure to DDT emitted by Ciba on their properties.  That finding in turn would support a jury determination that Ciba's trespass on plaintiffs' property was not *de minimis*, that such health risks have interfered with plaintiffs' quiet use and enjoyment of their property, that property contaminated to the point of causing health risks would be worth less than property free of such contamination, and that Ciba should be required to pay for the clean-up of plaintiffs' property to those benchmark levels.  In short, expert evidence that one with plaintiffs' age and exposure characteristics who resides at plaintiffs' property would face a heightened risk of contracting cancer because of DDT contamination originating from Ciba would support a jury finding that Ciba's trespass on plaintiffs' property exceeded *de minimis* levels and depressed plaintiffs' property values (inasmuch as clean-up is needed to avoid excess health risks, and home buyers would presumably pay less for a house that comes with an elevated cancer risk than for a comparable house with no such risk).

On this basis, the undersigned concludes that Dr. Schuhmann's opinions have a sufficient nexus to the issues joined in this litigation to satisfy evidentiary thresholds of relevance.

### B.   Objections to Dr. Schuhmann's Qualifications.

Defendants further object that Dr. Schuhmann "lacks the qualifications or expertise to conduct a risk assessment" (Defendants' Brief, at 8), and that he "lacks the expertise and qualifications to opine on risk assessment issues" (Reply Brief, at 6).  This argument fares no better here than it did when defendants raised it with respect to Kaltofen; indeed, it borders on absurdity.  The undisputed evidence is that Dr. Schuhmann holds both master's and doctorate degrees in environmental engineering, that he has 15 years of experience as a consulting environmental engineer, and that he has performed "numerous quantitative risk assessments" during that time.  (Schuhmann Aff., at 1.)[20]  In his deposition, Dr. Schuhmann confirmed the

_____

[20]      As they did with respect to Kaltofen, defendants attack the form of the Schuhmann Affidavit as being improper because it was not notarized.  Once again, this contention is a red herring.  Although styled as an Affidavit, this exhibit unquestionably satisfies the requirements of 28 U.S.C. § 1746 for an unsworn declaration, inasmuch as it is signed, dated

point by testifying, "I've got 15 years of experience in doing these types of assessments. I've taught risk assessment at the university level." (Schuhmann Dep., at 131.) His graduate coursework and doctoral dissertation included significant components of quantitative risk assessment. (Schuhmann Aff., at 5.) He lists a dozen specific consulting projects in which he has performed quantitative risk assessment in the environmental context. (Id. at 6-7.) On this record, Dr. Schuhmann is obviously qualified to provide expert opinions in the field of environmental risk assessment.[21]

---

and includes the express statement that all statements contained therein "are made under pain and penalty of perjury in accordance with Federal law." (Schuhmann Aff., at 30.) The Court will not reject the Schuhmann Affidavit out of hand simply because it should have been labeled a declaration instead of an affidavit. Equally unavailing is defendants' condemnation of the filing as a "last minute sham affidavit." (Reply Brief, at 1-2.) Defendants balk that Dr. Schuhmann has used the Affidavit as a platform to respond to criticisms leveled at his report by defendants' expert, Dr. Anderson; however, the Court is aware of no legal, procedural or equitable principle that forbids an expert from attempting to rebut an attack by an adversary's expert by providing explication that was not described in the initial report. In a battle of dueling experts, an expert must be allowed to defend himself and to respond to his opponent's incursions against his initial opinion. To hold otherwise would be unfairly to penalize an expert for not wasting scarce resources by expanding his initial report *ad infinitum* to encompass anticipatory rebuttals of every potential challenge to his opinions that the other side might raise at some future time. The Federal Rules of Civil Procedure cannot reasonably be read to require a witness to shadowbox with himself in that fashion, on pain of being forbidden to fend off an attack in the future. Finally, as was the case in the Kaltofen Motion, the Court declines defendants' invitation to engage in a line-by-line comparison of Dr. Schuhmann's report and Affidavit to ascertain whether any new information is presented, and then strike the latter if there is. Defendants' general and conclusory statement that the Affidavit must be stricken "[t]o the extent this affidavit presents any new information" (Reply Brief, at 2) does not recite an objection with sufficient specificity to enable the Court to address it, and the Court will not refine defendants' objection for them. For all of these reasons, defendants' request that the Schuhmann Affidavit be stricken is **denied**.

[21]     The irony here is that, while defendants protest that Dr. Schuhmann is not qualified to offer expert opinions concerning environmental risk assessment, both Dr. Schuhmann and defendants' expert, Dr. Anderson, agree that he did not in fact perform a quantitative risk assessment in this case. Dr. Schuhmann emphatically states, "I *did not* perform a quantitative risk assessment in this case." (Schuhmann Aff., at 7.) In an affidavit submitted by defendants along with their reply brief, Dr. Anderson also states, "Dr. Schuhmann did not conduct a risk assessment in this case." (Anderson Aff. (doc. 531, Exh. A), at 2.) All of this highlights a conundrum as to why both parties have argued so vehemently as to whether Dr.

Defendants' objections are twofold.  First, they contend that he is not qualified because he has not done certain things (such as completing an EPA risk assessment, being tendered as a risk assessment expert, authoring risk assessment guidelines, or writing a carcinogenicity study). For starters, defendants' citations to Dr. Schuhmann's deposition do not match up for most of these points.  Even if they did, defendants have failed to explain why any of those achievements is a prerequisite to Dr. Schuhmann being qualified to render expert opinions in this case, given his extensive educational and experiential background in this field.  Second, defendants argue that Dr. Schuhmann is less qualified than their expert, Dr. Anderson.  Of course, nothing in the *Daubert* analysis would allow only the more qualified of the litigants' respective experts to opine about a given issue.  The relative qualifications of dueling experts is utterly irrelevant for admissibility purposes, although they certainly may influence the weight that the jury accords each expert's testimony when they square off at trial.  For purposes of the undersigned's gatekeeper function under Rule 702, what matters is whether Dr. Schuhmann is qualified to offer expert opinions.  Whether he is more or less qualified than Dr. Anderson is of no consequence in the *Daubert* analysis.

As it was with respect to Kaltofen, defendants' objection that Dr. Schuhmann is unqualified is misguided.  In particular, it ignores overwhelming evidence to the contrary and asks the Court to disqualify an expert based on arbitrary criteria delineated by defendants with no evidentiary mooring for why those criteria are a condition precedent to expert status.  The Court cannot agree that Dr. Schuhmann is unqualified to render his opinions in this case.

> **C.      Objections to Dr. Schuhmann's Methodology.**

Notwithstanding the foregoing skirmishes, the principal battleground concerning Dr. Schuhmann's testimony is whether his methodology is reliable.  In particular, defendants urge the Court to declare his methods unreliable on the following grounds: (a) he has applied a

---

Schuhmann is qualified to perform a risk assessment in this case, when the experts agree that that's not what he did here.  This is akin to two cooks arguing about the relative merits of cooking with butter or margarine when their recipe calls for neither.  To be clear, the Court's finding on the record before it is that Dr. Schuhmann is qualified to provide the expert opinions that he has rendered in this case, irrespective of whether they are characterized as a risk assessment or something else.

forward looking model backwards; (b) his application of the model is not anchored to any real data; and (c) he has made speculative and unreasonable assumptions.

### 1.    Dr. Schuhmann's Actual Methodology.

Although the litigants spill considerable ink in arguing over whether Dr. Schuhmann's methodology is or is not reliable, they devote limited attention to explaining precisely what he did.  Careful review of Dr. Schuhmann's expert report reflects that he utilized a methodology developed by the Environmental Protection Agency ("EPA") for setting indoor clean-up/remediation goals after the terrorist attacks on the World Trade Center on September 11, 2001 (the "WTC Protocol").  Dr. Schuhmann began by setting target lifetime excess cancer risks for three different scenarios: a 1-in-10,000 lifetime excess risk of contracting cancer, a 1-in-100,000 lifetime excess risk of contracting cancer, and a 1-in-1,000,000 lifetime excess risk of contracting cancer.[22]  His analysis and calculations then answer the question, for each of those target risk scenarios, of what level of present-day contamination in settled indoor dust would create such an excess risk for each of plaintiffs Byrd, Fisher and McIntyre, given their exposure histories to Ciba-emitted DDT.[23]  For example, if one wished to ensure that Byrd faced no more than a 1-in-1,000,000 excess risk of contracting cancer from DDT in settled indoor dusts, given her history of exposure to DDT emitted by Ciba, then the concentration of DDT in those dusts at the beginning of 2007 could not exceed 6.5E-06 $\mu g/m^2$.  To the extent that DDT in settled indoor dusts in Byrd's home exceeded that concentration at the beginning of 2007, Dr. Schuhmann's analysis would call for the clean-up of her residence until such time as the concentration fell to or below that benchmark.[24]

---

[22]    Dr. Schuhmann also performed target risk scenario calculations for non-cancer health-based benchmarks; however, in the interests of simplicity, the Court will focus on the cancer benchmarks in this discussion.

[23]    It is unclear from examining Dr. Schuhmann's report and his 30-page affidavit why his computations were limited to plaintiffs Byrd, Fisher and McIntyre, and why he excluded plaintiffs Greer and Reed from that analysis.

[24]    Both sides' experts would undoubtedly take this Court to task for using the term "concentration" rather than the scientifically correct term of "surface loading."  The reason for this rebuke would be that the WTC Protocol calculations work in terms of "surface loading" (*i.e.*, amount of contaminant mass per surface area) rather than "concentration" (*i.e.*, amount of

The computations themselves are mathematically complex, and consume many pages of the appendices of Dr. Schuhmann's report.  To the best of the Court's understanding, however, Dr. Schuhmann's parameters and assumptions in performing his calculations included the following: (a) he relied on EPA guidance for toxicity values, reference doses and cancer-slope factors for the contaminants of concern; (b) he assumed that DDT, DDD and DDE entered plaintiffs' homes in 1966 (the year after Ciba's McIntosh plant stopped producing DDT), that plaintiffs had never been exposed to DDTr-laden dusts originating from Ciba in their homes prior to 1966, and that no new DDTr from Ciba emissions infiltrated their homes after 1966;[25] (c) he plugged in known information about each plaintiff's age during the 1966-2007 period of exposure, and excluded any years in which that plaintiff was known to have lived elsewhere; and (d) he assumed that contaminants in settled indoor dust would dissipate with time (through cleaning, re-suspension, dilution, and perhaps volatilization) at a constant "decay" rate of 0.38 $yr^{-1}$, a figure derived from the WTC Protocol.  Based on the resulting calculations, Dr. Schuhmann opined that "[i]f technologically feasible, the clean-up goals should be set equal to the selected target health-based benchmarks."  (Report (doc. 542), at 7.)

In a nutshell, then, Dr. Schuhmann made no direct findings about plaintiffs' excess lifetime cancer risks.  He did not directly opine as to whether clean-up is necessary or appropriate at any plaintiff's residence.  Instead, he used an EPA-established model for settled indoor dusts, input limited plaintiff-specific data, assumed that the exposure was based on contamination occurring in 1966, and computed the benchmark contamination levels that would

---

contaminant per mass of material).  (Anderson Aff., ¶ 10; Schuhmann Aff., at 29.)  The Court appreciates the difference in terminology.  Nonetheless, for purposes of improving the readability of this analysis, this Order will use the term "concentration" in describing the methodology, application and results of the model rather than the layman-unfriendly (albeit scientifically more accurate) term of "surface loading."

[25]     This assumption was apparently made for the sake of simplicity, and because there is no data of the rate at which DDT and its metabolites may have entered plaintiffs' homes prior to 1966.  By using 1966 as an initial exposure date, Dr. Schuhmann intended to underestimate the cumulative risk for each plaintiff in calculating health-based benchmarks for each plaintiff, and therefore to set less stringent clean-up benchmarks than would have been attained had pre-1966 exposures been incorporated into the analysis.

-24-

correspond to various appropriate target risk levels.  By comparing actual observed contamination levels in 2007 to those benchmarks, one could ascertain whether and to what extent clean-up is necessary at a particular location to reduce the excess cancer risk to the target level.  Dr. Schuhmann's proposed expert opinions go no further than to establish that benchmark for comparative purposes.[26]

Armed with this exposition of Dr. Schuhmann's methodology, the Court now addresses defendants' specific objections to the reliability of his approach, to-wit: (i) that the WTC Protocol is not appropriate for this kind of retroactive risk analysis; (ii) that he has failed to anchor his results to real data; and (iii) that he has made unreasonable assumptions.

### 2.    Objections Concerning Retrospective Application of WTC Model.

Defendants appear to agree that the WTC Protocol is a viable, appropriate method for setting remediation goals to ward off excess risks of cancer based on exposure to DDTr.[27]  There is similarly no dispute that the WTC Protocol was developed by multiple governmental agencies, was peer-reviewed by 11 independent experts, and has been accepted by the scientific community as a theoretically sound model.  (Schuhmann Aff., at 15.)  Nor do defendants disagree with the accuracy of Dr. Schuhmann's mathematical computations; in fact, defendants' expert, Dr. Anderson, specifically found in her report that "Dr. Schuhmann has computed his values in a computational[ly] correct manner."  (Anderson Report (doc. 506, Exh. B), at 28.)  Dr. Schuhmann has testified emphatically that he "has not altered or modified the EPA WTC model in any way at all."  (Schuhmann Aff., at 27.)  So what, then, is the problem?

---

[26]    Interestingly, although the parties have devoted dozens of pages to arguing about the admissibility of Dr. Schuhmann's report, neither side discusses the results of the relevant comparison.  If the measured concentration of DDTr in 2007 at a particular plaintiff's residence is below the benchmarks set by Dr. Schuhmann, then his analysis would imply that no remediation is needed to keep that plaintiff's lifetime excess cancer risk below the target risk scenario.  The Court cannot discern from the parties' briefs on the Motion in Limine what the results of such a comparison are in this case.

[27]    Indeed, defendants' expert, Dr. Anderson, testified that she was unaware of a better methodology for assessing health risks from indoor dust exposure than the WTC Protocol.  (Anderson Dep., at 140.)  Dr. Anderson also states in her July 3, 2007 Affidavit that she applied the WTC Protocol in her own analysis as well, although the parties have not submitted that part of her expert report.  (Anderson Aff. (doc. 531, Exh. A), at ¶ 11.)

The heart of the professional disagreement between Dr. Schuhmann and Dr. Anderson, and hence the core of the *Daubert* Motion, is whether it is a scientifically reliable procedure to take the WTC Protocol and work backwards, rather than forwards.  The WTC Protocol was originally designed to determine risk-based clean-up levels on a going-forward basis for buildings near the former Twin Towers in New York City after the 9/11 attacks.  The contamination had just occurred, and the WTC Protocol calculated benchmarks on a prospective basis for the next 30 years to determine clean-up targets for those areas.  At any given point during those 30 years, observed contaminant concentrations can be compared to the model's benchmarks.  To the extent that observed readings exceed the benchmarks, additional remediation of excess contamination must be performed at those locations to keep total concentrations (and, hence, excess cancer risks) contained at or below the target level.  Over time, those benchmarks become lower and lower (*i.e.*, increasingly stringent) to reflect the fact that an individual's exposure interval to contaminated settled dust has grown longer, tending to increase cumulative health risks and therefore requiring more restrictive exposures in the future to prevent escalating lifetime excess risks.  (Schuhmann Aff., at 21.)

Presumably, if brand-new Ciba contamination were to arrive on plaintiffs' properties today, defendants would have no quarrel with Dr. Schuhmann applying the WTC Protocol on a forward-looking basis to set health-based benchmarks for future years.  By contrast, Dr. Schuhmann simply worked backwards.  He set the year 1966 (the year after DDT production ceased at the Ciba plant) as the onset of exposure to contaminated dust, calculated a benchmark for that year, then used the same decay factor utilized in the WTC Protocol to project forward to 2007 to set present-day benchmarks for three plaintiffs that factor in their cumulative exposure to those contaminants in their settled household dusts during the intervening 41 years.  According to Dr. Schuhmann, it makes no difference whether the model is calculated in a prospective or retrospective manner.  Either way, the fundamental calculations are the same, and the decay rate is the same.  The only difference is that by looking at the model in year 41, Dr. Schuhmann assumes 41 years of prior exposure to those settled DDT contaminants in indoor dusts for the three plaintiffs, whereas if he were starting the model in year 1, the benchmarks would be much higher (*i.e.*, less stringent) because the model would not then account for plaintiffs' cumulative exposure during the previous 41 years.  Stated differently, Dr. Schuhmann's view is that, given

the fixed decay rate and the proper exposure parameters, there is no meaningful difference between running the WTC Protocol in year 1 and looking forward, and running it in year 41 and looking backward. (Schuhmann Aff., at 21-22.)   Either way, the WTC Protocol produces a downward-sloping curve showing falling benchmarks over time, beginning with the year of the initial exposure.  According to Dr. Schuhmann, after using the WTC Protocol to generate the downward-sloping curve, one can select any point along that curve to get the benchmarks for that year, and the process is the same from a modeling standpoint regardless of whether one begins in 2001 and looks forward, or whether one looks backward from 2007 to an initial exposure in 1966.  (*Id.* at Figures A, B & C.)

Defendants counter that it is scientifically incorrect and unreliable to apply the WTC Protocol in the manner utilized by Dr. Schuhmann.  Dr. Anderson observes that Dr. Schuhmann is aware of no instances in which the model has been applied in this retrospective manner before.  (Anderson Report (doc. 506, Exh. B), at 29.)  She accuses Dr. Schuhmann of "perversion of the WTC method," which she contends yields results that are "highly questionable," "unverifiable," and "impossible."  (Anderson Aff. (Doc. 531, Exh. A), ¶ 7.)

After careful review of the testimony and opinions of both experts, the Court concludes that there are persuasive arguments on each side.  From defendants' standpoint, it is unsettling that this case apparently marks the first occasion on which an environmental engineer has utilized the WTC Protocol to go backward in time and compute health-based benchmarks for today based on modeled exposures for contaminants that infiltrated a house's dust long ago.  That no scientist has ever applied the model in this fashion naturally raises questions as to the legitimacy of doing so.  However, from plaintiffs' standpoint, the Court appreciates Dr. Schuhmann's detailed explanation that there is nothing conceptually different about calculating benchmarks in year 1 of an exposure to settled indoor dusts and looking forward, versus doing so in year 41 of an exposure and looking back.  Either way, the decay rate is the same, the exposure parameters are the same, and the WTC Protocol works the same, such that the only difference is where we are on the downward-sloping benchmark curve.  Dr. Anderson's rejoinder to that is that "an individual's possible past exposure has no bearing on the current risk or resulting impacts of risk on the value of property," such that screening values are more appropriate than the WTC Protocol for evaluating present-day risk at plaintiffs' properties.  (Anderson Aff., ¶¶ 5-

6.)  Dr. Schuhmann's response is that to take a present exposure in a vacuum, while ignoring all cumulative exposure to that contaminated dust over time in the past, is erroneous and that Dr. Anderson's analysis is therefore scientifically flawed.  (Schuhmann Aff., at 21-22.)

And so it goes, back and forth, parry and thrust, volley and save, attack and counterattack, between these two dueling experts.  Based on the well-developed record before it, the undersigned cannot determine conclusively that either expert's methodology is unreliable, or that either is scientifically "wrong."  Drs. Anderson and Schuhmann clearly have a difference of opinion as to the propriety of the latter's retrospective application of the WTC Protocol and as to the former's exclusion of historical exposures for assessing risk levels and clean-up needs at plaintiffs' contaminated properties today.  Under the circumstances, the Court reiterates that its *Daubert* gatekeeper function does not entail choosing between two reasonable but substantially differing approaches offered by these experts; therefore, the Court will not invoke that function to preclude either of these credible experts from having an opportunity to persuade the jury as to the veracity of their approaches.[28]  *See, e.g., Quiet Technology*, 326 F.3d at 1341; *Rink*, 400 F.3d at 1293 n.7 ("a district court may not exclude an expert because it believes one expert is more persuasive than another expert").

### 3.    *Objections Concerning Lack of Anchoring to Real Data.*

Defendants also criticize Dr. Schuhmann's analysis on the grounds that "[h]e has not

---

[28]    That said, a word of caution is in order for both sides.  As counsel must realize, the expert opinions of both Dr. Anderson and Dr. Schuhmann are highly technical.  They are dense.  They rely heavily on jargon, extremely detailed mathematical computations, and scientific concepts that are likely to elude the grasp of the average non-scientist (including jurors and jurists alike).  What's more, both experts are prone to digressions that are virtually impossible for a non-engineer to follow, as shown for example in the many pages of argument between Dr. Anderson and Dr. Schuhmann in their respective affidavits concerning the correctness of a single mathematical computation performed by Dr. Schuhmann.  (Dr. Schuhmann devoted six single-spaced pages of his affidavit to sparring with Dr. Anderson about this computation at an extremely technical level.)  Despite spending hours poring over their reports and affidavits, the undersigned admits to having difficulty understanding with exactitude the finer points of this debate.  If the parties wish to present these experts' testimony to a jury, they may do so; however, if they want the jury to glean anything of value from that testimony and if they want anything constructive to emerge from that testimony, then they should think long and hard about how to present it in a manner that will not simply drown the finder of fact in a mass of esoteric and highly technical concepts.

anchored it to any real data." (Defendants' Brief (doc. 506), at 9.) In this regard, defendants fault plaintiffs' expert for "ignor[ing] actual numbers for the 2007 DDT concentrations in dust at Plaintiffs' residence that Kaltofen reported in his samples." (*Id.* at 12.) However, the actual concentrations of DDTr in household dust at any given time are not an input in the WTC Protocol. The purpose of the model is to establish health-based benchmarks against which observed contamination data may be compared to see if additional clean-up is necessary. As the Court understands it, one would not plug observed DDT values into the WTC Protocol at any time for purposes of calculating the requisite benchmarks; rather, the benchmarks are derived separately from (and without reference to) the actual concentration of the contaminant at any given moment in time.[29] As such, defendants' insistence that Dr. Schuhmann should have used Kaltofen's test results in preparing his benchmarks is misplaced.[30]

In challenging the anchoring to real data, or lack thereof, defendants also claim that Dr. Schuhmann unreliably made "hypothetical assumptions about the ages and weights of hypothetical people the same age as these Plaintiffs without anchoring his model in any way to real numbers." (Defendants' Brief, at 11.) The point about hypothetical ages is nonsensical, because defendants concede that Dr. Schuhmann used the plaintiffs' actual ages, so there is

---

[29]    As Dr. Schuhmann explained, "the health-based benchmarks provided in my report (and in the EPA WTC report) were developed to be <u>compared</u> to real data and do not depend on the surface loadings in peoples [*sic*] homes." (Schuhmann Aff, at 25.)

[30]    In their reply brief, defendants attempt to couch this argument in terms of a failure by Dr. Schuhmann to use real data to verify his model. But defendants talk out of both sides of their mouths on this point, criticizing Dr. Schuhmann's method by saying that it "cannot be tested using real numbers" and then, in the very next sentence, arguing that it flunks a test using real numbers. (Reply Brief, at 3.) Which is it? Defendants' apparent indecisiveness about their own line of argument makes it more difficult to evaluate such argument. Nor is it persuasive to argue, as defendants do repeatedly, that Dr. Schuhmann's benchmarks should be rejected because his retrospective application of the model means that its predictions cannot be verified by comparing them with real-life data in each passing year. Of course, just because the model's predictions cannot be verified each year does not mean that the otherwise valid, peer-reviewed, scientifically-rigorous model has been incorrectly applied. Moreover, any discrepancies between observed concentrations and predicted benchmarks in the model might be explained by numerous other considerations totally divorced from any flaws in the application of the model, so the notion that Dr. Schuhmann's results are necessarily unreliable without validation using real-world data is not well taken.

nothing hypothetical about that.  More generally, contrary to defendants' condemnation of his report, Dr. Schuhmann demonstrably used real data concerning plaintiffs in his exposure inputs in the model.  He avers that he "incorporated plaintiff specific age data (*e.g.* Jessie Fisher was 39 years old in 1966 not 1 year old) and [he] used the reported living histories provided by counsel to assign plaintiff specific exposure durations."  (Schuhmann Aff., at 20; *see also* Schuhmann Report, at Table 1.)[31]  With respect to plaintiffs' weight and exposure frequencies, Dr. Schuhmann used exactly the same inputs applied by the EPA in the WTC Protocol.  (*Id.* at 23.) In light of these facts, defendants' assertion that Dr. Schuhmann failed to anchor his calculations in real data is unavailing and does not provide a viable means for striking down his opinions pursuant to *Daubert*.

### 4.    *Objections Concerning Reasonableness of Assumptions.*

Finally, defendants contend that Dr. Schuhmann's opinions are not reliable because they involve unreasonable assumptions.  In particular, defendants accuse Dr. Schuhmann of "simply pick[ing] a year, 1966, and assum[ing] that was the last time DDT would have arrived at Plaintiffs' properties," all the while ignoring "the fact that DDT was still available for sale until 1972, and that it was manufactured for at least a decade prior to 1966."  (Defendants' Brief, at 10.)  Further, defendants contend that plaintiffs' expert improperly disregarded the possibility that any DDT found on a plaintiff's property could have arisen from sources other than Ciba, or could have arrived at different times.  Given these unrealistic and unreasonable assumptions, defendants argue, Dr. Schuhmann's calculations are utterly lacking in trustworthiness.

It is undoubtedly true that Ciba manufactured DDT at its McIntosh facility in years prior to 1966.  It is equally true that Ciba stopped manufacturing DDT at that site in 1965.  Under the circumstances, there is nothing unreasonable about assuming, as Dr. Schuhmann did in applying the WTC Protocol, that any DDT emitted by Ciba would have reached plaintiffs' property by no later than 1966.  Defendants do not appear to quarrel with that statement.  If Dr. Schuhmann

---

[31]    To the extent that defendants now quibble with the accuracy of the living history data provided by plaintiffs as to one plaintiff, the remedy is not to throw out Dr. Schuhmann's testimony in its entirety as unreliable under *Daubert*, but rather for him to correct his calculations to rectify any errors arising from inaccuracies that may exist in the living histories supplied by plaintiffs' counsel.

could reasonably assume that Ciba-emitted DDT must have reached plaintiffs' homes by no later than the year after Ciba ceased production of DDT at the McIntosh plant, then it was also reasonable for him to assume that all Ciba-emitted DDT arrived at plaintiffs' homes in that very year, because doing so had the effect of minimizing the total cumulative exposures computed by the model and resulting in less stringent benchmarks today than would otherwise obtain. (Schuhmann Report (doc. 542), at 4.)  It cannot be unreasonable for an expert to make assumptions that, if anything, skew his results in favor of the other side or understate his results from the plaintiff's standpoint.  If defendants are correct that Ciba-emitted DDT could have reached plaintiffs' homes in years prior to 1966, then Dr. Schuhmann's assumption works in their favor by not counting those pre-1966 exposures in calculating plaintiffs' cumulative exposures.  The lower a plaintiff's cumulative exposure, the less stringent the remediation benchmark in 2007 will be, and the less remediation will be necessary.  As such, this particular attack on Dr. Schuhmann's report essentially asks the Court to reject his opinions because he selected an assumption that favored defendants.  The Court declines to do so.

Nor does defendants' criticism related to background sources of DDT warrant the wholesale excision of Dr. Schuhmann's expert opinions from this lawsuit.  Dr. Schuhmann's report specifically noted that background concentrations of contaminants were a factor of interest and should be considered in setting target risk scenarios and formulating remediation goals. (Schuhmann Report, at 3, 7.)  Moreover, plaintiffs' expert observes that the peer-reviewed, undoubtedly reliable WTC Protocol assumed that no other sources of contaminants existed, even though there were other sources and background levels of the contaminants of concern, such that those contaminants from background sources could continue to enter homes after the cessation point utilized in the model.  As Dr. Schuhmann stated, "the input of PAH laden dust from background sources into homes subsequent to the cessation of PAH inputs from the WTC collapse did not deter the EPA from employing the EPA WTC methodology to establish health-based benchmarks for PAHs."  (Schuhmann Aff., at 18.)  If the EPA's assumptions concerning background sources do not render its application of the WTC Protocol unreliable, then surely Dr. Schuhmann's expert testimony should not be excluded in its entirety for making the very same assumptions.  That observation persuasively rebuts defendants' concern that Dr. Schuhmann's work has been somehow rendered unreliable or in violation of the tenets of the WTC Protocol

because he has not taken background sources into account.

**VI.    Conclusion.**

For all of the foregoing reasons, defendants' Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Theodore Farber (doc. 500); Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Marco Kaltofen (doc. 501); and Motion in Limine to Exclude Expert Testimony, Opinions and/or Reports of Richard Schuhmann (doc. 506) are all due to be, and the same hereby are, **denied**.

DONE and ORDERED this 7th day of August, 2007.

s/ WILLIAM H. STEELE  _____
UNITED STATES DISTRICT JUDGE