**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **JESSIE FISHER,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 03-0566-WS-B** |
| | ) |
| **CIBA SPECIALTY CHEMICALS** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on four motions for summary judgment, as well as an ancillary motion.  These motions consist of the following: Defendants' Motion for Partial Summary Judgment on Fraud, Misrepresentation and RICO Claims (doc. 405); Defendants' Motion for Summary Judgment on All Claims of William Ronald McIntyre (doc. 406); Defendants' Motion for Summary Judgment (doc. 502); Plaintiffs' Motion for Partial Summary Judgment on Defendants' Affirmative Defenses #1, 2, 4, 6, 10, 11, 14, 23, 30 and 43 (doc. 503); and Defendants' Motion to Strike Plaintiffs' Affidavits (doc. 539).[1]  All of these Motions have been briefed and are ripe for disposition.

**I.      Overview.**

This long-running action commenced in August 2003 when four individuals filed a putative class action against defendants Ciba Specialty Chemicals Corporation, Ciba-Geigy Corporation, Novartis, Ltd., Inc. and Syngenta Crop Protection, Inc. (collectively, "Ciba"). Although the operative version of the Complaint sounds in a panoply of legal theories (including negligence, conspiracy, strict liability, trespass, nuisance, intentional/negligent

_____

[1]       The Motion to Strike found at document 539 represents defendants' second attempt to file their Motion electronically.  The first attempt, found at document 538, failed because of technical difficulties, but still appears on the docket sheet as a pending motion.  As a housekeeping matter, the iteration of the Motion to Strike found at document 538 is deemed **moot** because it was supplanted by the properly filed version found at document 539.

misrepresentation, fraud and fraudulent concealment, constructive fraud, and civil RICO), the crux of plaintiffs' claims is that the value of their property in McIntosh, Alabama, has been impaired by contaminants emanating from Ciba's nearby chemical manufacturing facility, which is located approximately 1.3 kilometers northeast of McIntosh.  That facility was designated a Superfund site by the U.S. Environmental Protection Agency nearly a quarter century ago. Simply put, plaintiffs contend that their properties are contaminated by DDT emitted from Ciba's McIntosh plant, and they want Ciba to make them whole.

Following a protracted period of class discovery and a two-day evidentiary hearing, the undersigned entered an extensive Order (doc. 386) on July 14, 2006, denying class certification. *See Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006).  A substantial and often contentious merits discovery period ensued, punctuated by discovery disputes and judicial interventions on discovery, merits, and procedural matters.  At long last, this action is ready for trial, which is set for November 7, 2007.  The joint proposed Pretrial Order (doc. 534) submitted by the parties on July 12, 2007 governs the operative claims and defenses in this action.[2]  That document reflects that, in its present configuration, this action involves individual claims against Ciba brought by five plaintiffs: Jessie Fisher, Arlean Reed, Barbara Byrd, Sharon Greer and Ronald McIntyre.  All plaintiffs assert the following causes of action pertaining to alleged property damage caused by Ciba contamination: negligence, nuisance, fraud and fraudulent concealment, strict liability, trespass, and civil RICO.  (Doc. 534, at 15-38.)

Because the relevant facts and law for each of the four pending Rule 56 motions differ, each of them will be addressed separately.  Unlike the other three motions, which seek partial relief only, defendants' Motion for Summary Judgment (doc. 502) seeks relief that would

---

[2]      As set forth in this Court's Standing Order Governing Final Pretrial Conference (doc. 395, at attachment), this joint proposed Pretrial Order "shall constitute the final statement of the claims to be litigated, shall govern the conduct of the trial, and shall constitute the basis for any relief afforded by the Court."  (*Id.*, ¶ 5.)  Therefore, the Court looks to this jointly prepared and jointly filed document as the parties' final, conclusive statement of the legal claims and defenses joined for trial, except insofar as it may be modified by order of this Court.

conclude this action in its entirety; therefore, it is logical to commence the analysis there.[3]

## II.   Defendants' Motion for Summary Judgment (doc. 502).

In this Motion, defendants assert that they are entitled to entry of judgment as a matter of law on all claims in this action because plaintiffs have failed to produce any evidence of damages or injury.  Specifically, Ciba contends that the record is "devoid of any evidence" on the following subjects: (1) the current or historical value of plaintiffs' properties; (2) any change in value over time; (3) any link between such a change in value and Ciba's activities; (4) the cost of remediation at the properties; (5) the relative magnitudes of the diminution in value and the cost of remediation; and (6) the rental value of those properties.  (Ciba Brief (doc. 504), at 2.) Plaintiffs counter that summary judgment should be denied because there is ample record evidence of damages.

### A.   *Motion to Strike.*

Before reaching the Motion for Summary Judgment itself, the undersigned examines Defendants' Motion to Strike (doc. 539), inasmuch as a ruling on that Motion may substantially affect the contours of the record.  Because any summary judgment evaluation necessarily hinges on the type and nature of facts in the record, and because the Motion to Strike calls into question

---

[3]      All four Motions for Summary Judgment will be evaluated in accordance with the time-honored standard that summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

which facts are properly before the Court, resolution of that Motion is the appropriate analytical starting point.[4]

Contemporaneously with their opposition brief to the Rule 56 Motion, plaintiffs filed five short affidavits, one from each plaintiff, offering plaintiffs' opinions concerning the value of their property.[5]  For example, plaintiff Jessie Fisher averred that she believed her property was "worthless since it was polluted by Defendants' chemicals"; that her property has an assessed value of $74,800, but that she believes it "would be worth approximately $200,000 if it were not contaminated"; and that she believes that her "property has been devalued due to the DDTr contamination in [her] home."  (Doc. 527, Exh. B.)  The other four affidavits are similar, inasmuch as each plaintiff states how long he or she has lived on his or her property, how much he or she believes the property is worth now, how much he or she believes it would have been worth in the absence of contamination by Ciba, and his or her belief that the property has been devalued by Ciba's DDTr contamination.  (Doc. 527, Exhs. C-F.)

Defendants protest that all five affidavits should be stricken on the grounds that they contain information withheld from Ciba during discovery and they constitute sham affidavits. (Doc. 539, at 1.)[6]

_____

[4]      Defendants do themselves a disservice by utilizing the Motion to Strike (and the accompanying briefing) to reiterate, rephrase, and in some cases revamp or reshape arguments presented in their reply brief on summary judgment.  The resulting redundancies and refinements in the briefing have needlessly confounded the Court's efforts to understand the precise objections that defendants are lodging with respect to the subject affidavits.  Also, by diverting some of their arguments for striking the affidavits from the Motion to Strike and into the reply brief on summary judgment, defendants have effectively prevented plaintiffs from responding to those issues, given the disfavor with which sur-replies are regarded in federal court.

[5]      Technically, these "affidavits" are actually unsworn declarations signed under penalty of perjury and filed pursuant to 28 U.S.C. § 1746.  These filings do not comply fully with the requirements of § 1746, inasmuch as they are, for example, undated; however, as defendants have not objected to the form or technical aspects of the statements, the Court will not examine those matters *sua sponte*.  There is apparently no dispute that all five affidavits were executed in or around June 2007.

[6]      In addition to the Rule 37 and sham affidavit arguments, defendants devote one paragraph of their memorandum to arguing that the affidavits are speculative.  That contention is presented in skeletal fashion in the Motion to Strike, and is not even listed as a separate ground

-4-

*1.     Whether Plaintiffs Withheld Information in Discovery.*

As an initial matter, Ciba maintains that the affidavits should be barred because plaintiffs breached their duty to amend their incomplete and incorrect responses to interrogatories propounded by Ciba.  This argument invokes Rule 37(c)(1), Fed.R.Civ.P., which provides in pertinent part as follows:

> "A party that without substantial justification fails to disclose information required by Rule 26(a) or Rule 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed."

*Id.*  Rule 26(e)(2), in turn, states that "[a] party is under a duty seasonably to amend a prior response to an interrogatory ... if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Rule 26(e)(2), Fed.R.Civ.P.  "The burden rests upon the non-producing party to show that its actions were substantially justified or harmless."  *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001); *see also Murdick v. Catalina Marketing Corp.*, 496 F. Supp.2d 1337, 1347 (M.D. Fla. 2007) (same).

This objection to plaintiffs' affidavits hinges on Question 4 of "Defendants' First Set of Interrogatories to Each Named Plaintiff," which asks plaintiffs to provide information concerning any "Appraisal" of their property's value.  (Doc. 539, at Exh. 1.)  The interrogatories define the term "Appraisal" as constituting "any formal or informal evaluation or estimation of property value."  (*Id.*)  In response to that interrogatory, each plaintiff wrote, "I know of no appraisals ever performed on our land however, the enclosed tax assessment includes an estimated value for my property."  (Doc. 537, at Exh. 2.)  Ciba now argues that by submitting affidavits containing their opinions of property values, plaintiffs are circumventing the discovery

_____

for the relief requested; however, Ciba developed the argument to a much greater extent in briefing the Motion for Summary Judgment.  It is unhelpful and inefficient for counsel to brief the same arguments in two different ways in a Rule 56 Motion and an accompanying Motion to Strike.  Be that as it may, rather than weighing the argument twice based on two overlapping but not identical sets of arguments by Ciba in briefing two motions, the Court will defer discussion of the "speculation" issue until reaching the merits of the Motion for Summary Judgment.

rules and interjecting information that should have been provided long ago in interrogatory responses or the seasonable supplementation of same.  But defendants' contention ignores the fact that each plaintiff's interrogatory responses included the following language: "Plaintiff objects to the definition of 'appraisal' as being vague and ambiguous and is [*sic*] susceptible to multiple interpretations."  (*Id.*)  This objection correctly highlights the lack of clarity as to whether Interrogatory #4 sought information from plaintiffs as to their own subjective opinions of property values.  Is a plaintiff's subjective opinion of how much his or her property is worth a "formal or informal evaluation or estimation of property value"?  Perhaps, but perhaps not.  Certainly, a plaintiff's subjective, lay opinion of how much his or her property is worth would not fit under any common-sense definition of "appraisal".  Under these circumstances, plaintiffs properly objected to an ambiguous question, and answered it in accordance with their interpretation of it.  Had defendants wished to pin the plaintiffs down as to their own subjective, unscientific opinions of their property value, they could have asked more precise interrogatories or defined the term "appraisal" in an inclusive manner that alleviated any reasonable confusion, or used different terminology altogether.  Defendants cannot now take advantage of the ambiguity in their own Interrogatory #4 to exclude plaintiffs' affidavits.

Ciba also objects that plaintiffs' affidavits conflict with Interrogatory #9 from the class discovery period, which asked plaintiffs to itemize and describe in detail "each item and each element of damages."  (Doc. 539, at Exh. 1.)  In response, each plaintiff posited an array of objections (not the least of which was that the specifics of their damages were outside the scope of the class discovery being performed at that time), then stated, "Plaintiff has sustained damages to [his or her] residential property and/or property devaluation as well as other damages to which plaintiff may be entitled including but not limited to, relocation expenses ...."  (Doc. 537, at Exh. 3.)  To be sure, plaintiffs' affidavits contain detail beyond that set forth in the Interrogatory #9 response; however, there is no contradiction.  The information provided in response to Interrogatory #9 was furnished subject to multiple objections.  If Ciba felt that plaintiffs' answers to Interrogatory #9 were not responsive or that those objections were legally unfounded, their recourse was to bring their concerns to plaintiffs' attention and, if necessary, petition the Magistrate Judge to compel further itemization of damages.  Alternatively, they could have simply re-asked the question during merits discovery, at which time plaintiffs' facially colorable

objection that the request called for information exceeding the scope of class discovery would be inapplicable.  Ciba elected to do neither of these.  Having apparently allowed that original, partial answer to go unchallenged, and having never sought detailed information on damages during merits discovery, Ciba cannot now be heard, years later, to clamor that plaintiffs' partial responses to Interrogatory #9 justify striking the affidavits pursuant to Rule 37.

> 2.     *Whether Plaintiffs Have Filed Sham Affidavits.*

Next, Ciba protests that plaintiffs' affidavits amount to "sham affidavits" that "directly contradict Plaintiffs' deposition testimony and responses to interrogatories."  (Doc. 539, at 4.)  "Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003); *see also Fisher*, 238 F.R.D. at 284 (explaining and applying "sham affidavit" rule).  The Eleventh Circuit has recently cautioned that the sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case."  *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (citation and internal quotations omitted).  For that reason, and to avoid depriving the trier of fact of the opportunity to discern which witnesses are telling the truth and when, this Circuit "require[s] the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."  *Id.* (citation omitted).

From the wealth of discovery materials exchanged by the parties, the only discrepancies identified by Ciba lie in the interrogatory responses discussed *supra* and the deposition testimony of plaintiff Barbara Byrd.  Neither of these items displays the sort of inherent inconsistency required under *Allen* for the sham affidavit rule to come into play.  As already mentioned, defendants are at fault for the ambiguities in Interrogatory #4, to which plaintiffs properly and timely objected.  There is nothing more than a possible inconsistency (and certainly no inherent inconsistency) between plaintiffs' responses to Interrogatory #4 and their affidavits, given the potential for differing interpretations of the question.  And Byrd's deposition testimony consisted of nothing more than responding negatively when asked, "Have any idea of what you

-7-

think the property is worth today?" (Byrd Dep., at 19.)[7]  Although defendants also append

deposition excerpts from other plaintiffs to their Motion to Strike, those excerpts are not

discussed in the Motion and are certainly no more favorable to Ciba's position than the Byrd

excerpt is.[8]  Once again, there is no inherent inconsistency of the kind necessary to implement

the sham affidavit rule.  That Byrd may have had no idea what her property was worth at the

time of her deposition on May 10, 2005, does not necessarily negate the possibility that she

undertook to formulate such opinions prior to completing the June 2007 affidavit.  Nothing in the

deposition excerpt suggests that Byrd was incapable of formulating beliefs and opinions about

her property's value, or that she did not intend to do so in the future.  She simply was not asked.

More generally, all of the plaintiffs' affidavits may be reasonably viewed as clarifying

their deposition testimony, rather than contradicting it.  A necessary prerequisite to the sham

affidavit rule is that the party seeking to invoke it must have asked the necessary follow-up

questions to eradicate any "wiggle room" in the deposition answers given.  Ciba did not do so.

The questions asked and answers given simply do not seal off this line of evidence with the

definitiveness required for the sham affidavit rule to be triggered.  There being no inherent

inconsistency, the disfavored, sparingly-used sham affidavit rule is inapplicable.  *See Van T.*

*Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir. 1984) (explaining

that a nonmovant may create a genuine issue of material fact by submitting affidavit clarifying

testimony given in his deposition); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir.

2002) (observing that a nonmovant "may attempt to clarify or augment (but not contradict) prior

---

[7]        Remarkably, the parties disagree as to the language of the question, with plaintiffs
accusing defendants of misquoting Byrd's deposition transcript.  (Doc. 548, at 3 n.2.)  Plaintiffs
are mistaken.  They would apparently attribute an excerpt from plaintiff Jessie Fisher's
deposition to Byrd, which is obviously incorrect.  (*Id.*)

[8]        In particular, defendants cite to deposition testimony by plaintiff Sharon Greer
that she does not know whether the assessed value of her property has risen or fallen because she
had never had the property assessed by anyone (Doc. 539, Exh. 11, at 107-08); testimony by
plaintiff Jessie Fisher that she did not know as she sat for her deposition what her property's
value was (*Id.*, Exh. 12, at 27); testimony by plaintiff Arlean Reed that she had never spoken
with her tax assessor about whether her property value had risen or fallen (*Id.*, Exh. 13, at 70);
and testimony by plaintiff William McIntyre that he does not have any information "that gives an
appraisal or a value" of his property (*Id.*, Exh. 14, at 37-38).

deposition testimony through affidavits"); *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995) (stating that, even under the "sham affidavit" doctrine, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony"); *Stewart v. Board of Comm'rs for Shawnee County, Kansas*, 216 F. Supp.2d 1265, 1270 (D. Kan. 2002) (considering information in affidavits that served to clarify, explain or correct prior misstatements, as affidavits were not a "sham" with respect to such information).[9]

        **3.**      **Conclusion.**

For all of these reasons, Defendants' Motion to Strike Plaintiffs' Affidavits (doc. 539) is **denied**.  All five affidavits will be considered for summary judgment purposes.

        **B.**      ***Record Facts Concerning Damages.***[10]

Viewed in the light most favorable to plaintiffs, the record contains evidence of damages that is specific to each of the five plaintiffs.  Although that evidence is generally similar for each plaintiff, the Court will examine it on a plaintiff-by-plaintiff basis.

Plaintiff Jessie Fisher declared under penalty of perjury in her Affidavit that she has lived on her property in McIntosh, Alabama for 36 years; that testing shows that the house on her property contains 240 parts per billion ("ppb") of DDTr; that Fisher believes her property "is worthless since it was polluted by Defendants' chemicals"; that the assessed value of her

---

[9]      None of this is to say, of course, that Ciba is precluded from using the deposition excerpts at trial to impeach plaintiffs' newfound opinions of property valuations.  Indeed, these excerpts may prove fertile ground for vigorous cross-examination.  A jury may find that Byrd's deposition testimony that she did not have "any idea" what her property was worth when her deposition was taken discredits her current opinions as to value.  Nothing herein will prevent or curtail defense counsel from asking such questions at trial.  Rather, the Court simply finds that the sham affidavit rule does not apply because there is only a <u>possible</u> inconsistency, rather than an <u>inherent</u> inconsistency between the affidavits and the prior testimony.  For this kind of variation in testimony, the proper approach in this Circuit is to test that inconsistency through cross-examination at trial and to allow the jury to weigh it in determining the witness's credibility, rather than to exclude it altogether.

[10]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, with respect to this and each of the other Motions for Summary Judgment addressed in this Order, the nonmovants' evidence will be taken as true and all justifiable inferences will be drawn in their favor.

property for tax purposes is $74,800; and that Fisher believes her property "would be worth approximately $200,000 if it were not contaminated." (Doc. 527, at Exh. B.)

Plaintiff Arlean Reed declared under penalty of perjury in an Affidavit that she has lived on her property in McIntosh, Alabama for 31 years; that testing shows that her house contains 15.4 ppb of DDTr; that her property "is worth less now then [*sic*] it was before it became known that [her] property was polluted by Defendants"; that her property would be less valuable if she disclosed the fact of contamination to prospective buyers; that her property is presently worth $40,000 to $50,000 in its contaminated condition; and that the property would be worth approximately $70,000 in the absence of contamination. (Doc. 527, at Exh. C.)

Plaintiff Barbara Byrd declared under penalty of perjury in an Affidavit that she has lived on her property in McIntosh, Alabama for 34 years; that testing shows that her house contains 143 ppb of DDTr; that if she "were to disclose to potential buyers that [her] property is contaminated, it will be less valuable then [*sic*] without the contamination"; that she believes defendants have permanently damaged her property; that her property has an assessed value for tax purposes of $29,460; and that Byrd believes her property would be worth $55,000 in the absence of DDTr contamination. (Doc. 527, at Exh. D.)

Plaintiff Sharon Greer declared under penalty of perjury in an Affidavit that she has lived on her property in McIntosh, Alabama for 30 years; that testing shows that the house on her property contains 33,800 ppb of DDTr; that she believes her property to be worth $55,000 in its present contaminated state; that she believes defendants have permanently damaged her property; that the tax-assessed value of her property is $17,900; and that she believes her property would be worth $110,000 in the absence of DDTr contamination in her home. (Doc. 527, at Exh. E.)[11]

Finally, plaintiff Ronald McIntyre declared under penalty of perjury in an Affidavit that

---

[11]     In addition to this evidence, plaintiffs have submitted a deposition excerpt in which Greer testified that she does not go to the house very often since she learned that it is contaminated with DDTr. (Doc. 527, at Exh. H.) When she does go to the house, Greer testified, she wears rubber gloves. (*Id.*) Prior to receiving this information about DDTr contamination, Greer would go to the house "[q]uite often" or at least "a couple of times a month." (*Id.* at 124-25.) Greer also indicated that, although she does not want to sell her property, she might be willing to sell it for $50,000. (*Id.* at 132-33.)

he has lived on his property in McIntosh, Alabama for 42 years; that testing shows that the house on his property contains 840 ppb of DDTr; that he believes his property "is worthless since it was polluted by Defendants' chemicals"; that the assessed value of his property for tax purposes is about $26,900; that he believes his property would be worth approximately $110,000 in the absence of contamination; and that he believes the presence of DDTr in his home has devalued his property.  (Doc. 527, at Exh. F.)

As further evidence of the assessed values of their properties, plaintiffs offer a table showing the tax assessment values for each of their properties, broken down by parcel number, land valuation, building valuation, and mobile home valuation.  (Doc. 527, at Exh. G.)[12]

The record is clear that plaintiffs have not identified any expert witness whom they intend to call at trial to testify concerning differences in the valuation of plaintiffs' properties prior to and following Ciba's alleged contamination.  Rather, plaintiffs' sole direct evidence of diminution in value will be their own testimony.

### C.    *Legal Analysis.*

Defendants' Motion begins with the uncontroversial and uncontroverted premise that this is a case about property damages, and that plaintiffs do not seek any recovery for alleged personal injuries.  (Pretrial Order (doc. 534), at 2, 4.)  In the "Damages" portion of the Pretrial Order, the only damages identified by plaintiffs are those pertaining to diminution in the value of

---

[12]    Defendants object to this exhibit as being hearsay within hearsay, and further object that tax assessments are not admissible as direct evidence of value.  As to the first objection, defendants misstate the applicable legal standard for exhibits on a Rule 56 motion.  At this stage, a party is not required to furnish evidence in admissible form, so long as such evidence can be reduced to admissible form at trial.  *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n. 2 (S.D. Ala. 2003) ("Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial.").  There is no indication that plaintiffs cannot reduce their table of tax assessed valuations to admissible form at trial.  Defendants' second objection is likewise unavailing.  It is correct that tax assessments are not competent direct evidence of value, but such evidence may be admissible for a variety of other purposes.  *See Alabama Power Co. v. Hamilton*, 342 So.2d 8, 12 (Ala. 1977).  At this stage, it appears that those other purposes are motivating plaintiffs' inclusion of tax assessment data in the summary judgment record; therefore, there is no impropriety in their doing so.

their property by virtue of the alleged DDTr contamination by Ciba.  (*Id.* at 44.)[13]

The law in Alabama is quite clear that "[i]t is the plaintiff's burden to produce competent evidence establishing the existence of and amount of damages."  *SouthTrust Bank v. Donely*, 925 So.2d 934, 943 (Ala. 2005); *see also Marcus v. Lindsey*, 592 So.2d 1045, 1046 (Ala. 1992). That said, there is no general requirement that proof of damages take a particular form.  For example, rather than submitting documentation or expert witnesses, a plaintiff may testify as to his own damages, "so long as his testimony is based on facts and does not present medical conclusions or opinions that require expert testimony."  *Marcus*, 592 So.2d at 1046.  The plaintiff's burden of proof on damages is merely to produce "sufficient evidence to allow the factfinder to calculate damages without basing its award on guesswork."  *Livingston v. Tapscott*, 585 So.2d 839, 841 (Ala. 1991).

Under Alabama law, "[t]he proper measure of compensatory damages in a tort action based on damage to real property is the difference between the fair market value of the property immediately before the damage and the fair market value immediately after the damage."  *IMAC Energy, Inc. v. Tittle*, 590 So.2d 163, 168 (Ala. 1991).[14]  As one Alabama commentator has observed, "'Market value' is defined as the price at which a willing seller would sell and a willing buyer would buy, neither being compelled to sell or to buy.  This measure is left largely

---

[13]     The Pretrial Order is devoid of any suggestion that plaintiffs seek damages in the form of remediation costs or rents foregone; rather, plaintiffs' damages will be confined to diminution in value.

[14]     *See also Poffenbarger v. Merit Energy Co.*, --- So.2d ----, 2007 WL 1378333, *9 (Ala. May 11, 2007) ("the appropriate measure of direct, compensatory damages to real property generally is the diminution in the value of that property, even when the cost to remediate the property exceeds the diminution in the value thereof"); *S.S. Steele & Co. v. Pugh*, 473 So.2d 978, 982 (Ala. 1985) ("In general, the proper measure of damages for injury to property is the difference in market value before and after the injury."); *Illinois Cent. R. Co. v. Elliott*, 82 So. 582 (Ala.App. 1919) (where defendant allegedly caused plaintiff's storehouse to fall down, the measure of damages is the difference between the value of the property immediately prior to, and immediately subsequent to, the injury).  This notion is reinforced in the *Alabama Pattern Jury Instructions - Civil* (2nd ed.), § 11.26 of which reads as follows: "The measure of damage for (injury)(damage) to real property is the difference in the reasonable market value of the land immediately before its (injury)(damage) and the reasonable market value immediately after the (injury)(damage)."  *Id.*

to the discretion of the jury."  J. Marsh and C. Gamble, *Alabama Law of Damages* (5th ed. 2004), at § 33:1; *see also Crump v. Geer Bros., Inc.*, 336 So.2d 1091, 1096-97 (Ala. 1976) (similar). These black-letter principles are not disputed by either party.

Given that (a) a plaintiff bears the burden of producing competent evidence to show the existence and amount of damages, (b) plaintiffs' sole alleged damages in this case are to their property, and (c) the proper measure of damages in an Alabama tort claim based on damage to property is the diminution in value, Alabama law requires plaintiffs to submit evidence of diminution in their property values.  The gist of defendants' Motion for Summary Judgment is that plaintiffs have come forward with no evidence to satisfy this burden.[15]  The Court disagrees.

As a matter of Alabama law, plaintiffs' affidavits suffice to enable their state-law tort claims predicated on property damage to reach a jury.  There is no requirement under Alabama law that a plaintiff proffer expert testimony to establish the fair market value of his or her real property.  *See, e.g., Baldwin v. McClendon*, 288 So.2d 761, 768 (Ala. 1974) (witness who undertakes to opine about value of a piece of land need not be an expert if he or she "has given special attention to land values and has had an uncommon occasion to know them"); *Jim Walter Corp. v. Knodel*, 200 So.2d 473, 480 (Ala. 1967) ("[O]ne need not be an expert to testify as to value of real estate if he has had an opportunity for forming a correct opinion.").  Indeed, "[t]he general rule is that an owner of real estate is competent to testify as to its value."  *Alabama Power Co. v. Cummings*, 466 So.2d 99, 102-03 (Ala. 1985).[16]  Simply put, "a landowner can

---

[15]     Defendants further maintain that plaintiffs have marshaled no evidence to show the cost of restoring their properties to their original, pre-contamination condition, or to establish the rental value of those properties.  Under Alabama law, these are alternative means of establishing damages in at least certain types of property damage cases.  *See Borland v. Sanders Lead Co.*, 369 So.2d 523, 530-31 (Ala. 1979).  However, plaintiffs are not proceeding on a restoration or rental value theory of damages.  (Pretrial Order (doc. 534), at 44.)  Because those types of damages are not claimed in this action, the Court need not consider them further.  Thus, plaintiffs' proof of damages stands or falls on their ability to present admissible evidence of diminution in value.

[16]     *See also S.S. Steele*, 473 So.2d at 983 (plaintiff testified at trial that value of property had fallen because crack in slab had grown worse between date he moved in and date of trial); *Ryals v. Hunter*, 638 So.2d 2 (Ala.Civ.App. 1994) (property owner "is entitled to give her opinion as to the value of the property before and after the trespass to establish the legal measure

testify as to the value of his property, even if he is not an expert." *Seale v. Pearson*, 736 So.2d 1108, 1112-13 (Ala.Civ.App. 1999) (in nuisance action based on low-flying aircraft, plaintiff property owner's testimony regarding his investment in the property and his estimation of its rental value is sufficient evidence to support award of damages); *see generally* W. Schroeder & J. Hoffman, *Alabama Evidence 3d*, § 7:14 ("the owner of real or personal property is assumed to be qualified to give his opinion of the value of that property without further qualifications"). This is precisely what plaintiffs have done here, and that evidence is sufficient to meet their burden of establishing damages.

In response to this considerable Alabama authority, Ciba argues that this action is governed by the Federal Rules of Evidence, not by the Alabama Rules of Evidence.  That statement is certainly correct, but it does not help Ciba.  *See South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir. 1980) ("(A)n owner is competent to give his opinion on the value of his property (under the Federal Rules of Evidence).") (parenthetical in original).  Defendants do not point to any Federal Rule of Evidence that they contend plaintiffs' affidavits would violate.  While defendants broadly accuse plaintiffs of engaging in speculation and conjecture, the affidavits reveal that plaintiffs' opinions of the value of their land are based on decades of residing there.  Defendants identify no authority suggesting that a landowner must utilize scientific method, rigorous market analysis, or complex mathematical formulae to inform their opinions of property value.  Indeed, such a rule would completely undercut the Alabama law of damages (*i.e.*, that a landowner is competent to testify to his own property's value in a property damage case) by imposing a degree of rigor and real estate acumen which most landowners (who are unquestionably lay people without special training or expertise) could never achieve.  It would also run afoul of the principle recognized by federal courts that "[g]enerally, a landowner's opinion about the value of her land is admissible evidence."  *Joe T. Dehmer Distributors, Inc. v. Temple*, 826 F.2d 1463, 1466 (5th Cir. 1987).

---

of damages"); *Wilkens v. Kaufman*, 615 So.2d 613, 615 (Ala.Civ.App. 1992) ("A person may testify to the value of his or her land, even if that person is not an expert."); *Carson v. Canales*, 409 So.2d 842, 843 (Ala.Civ.App. 1981) (trial court relied on plaintiff's testimony that market value of his house had fallen from $58,000 to $50,000 or $51,000 because of cracked walls, sagging kitchen floor, and chimney that smoked through walls).

More generally, Ciba's objection is properly framed as one to the weight of this evidence, not its admissibility.  *See Dietz v. Consolidated Oil & Gas, Inc.*, 643 F.2d 1088, 1094 (5th Cir. 1981) ("The weight of such testimony is, of course, affected by the owner's knowledge of circumstances which affect value, and ... it is for the jury to evaluate the credibility of his testimony.") (citation omitted).

Equally unavailing is Ciba's objection that the affidavits should be disregarded as an improper attempt to file "what are actually expert reports (masquerading as the opinions of lay people in affidavit form) after the close of discovery and without properly designating themselves as experts who are expected to testify."  (Ciba Reply (doc. 537), at 11-12.)  To classify plaintiffs' affidavits as cleverly disguised expert reports is not persuasive.  *See Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007) (examining landowner's testimony as to value of his own property as lay opinion testimony under Rule 701, Fed.R.Evid., based on common-law presumption that a property owner is competent to testify on property values).  Ciba does not identify a single case authority from the last 30 years in which a property owner's testimony concerning the value of his or her property has been deemed subject to expert disclosure requirements under the Federal Rules of Civil Procedure.  This Court will not impose such a burden on plaintiffs here, even though Ciba strains to fit plaintiffs' affidavits into the "expert testimony" box.

Alternatively, defendants attempt to limit plaintiffs to testifying only as to the valuation of their properties today.  Specifically, defendants would bar plaintiffs from testifying that DDTr contamination has impaired the market value of their property, or what the degree of impairment in value might be.  But many of the cases cited *supra* have permitted landowners to offer just such opinions of how their property values have been affected by the occurrence of some contaminant, disruption or devaluation.  Ciba's only authority to the contrary is *dicta* in an unpublished opinion from a federal district court in Nevada, which in turn cited no authority in support of its finding that a property owner should be permitted only to testify as to actual property value, rather than the change in value occasioned by some devaluing event by defendants.  Plaintiffs' affidavits are competent evidence to show the diminution in value to their

properties.[17]

Finally, it appears from the Rule 56 filings that Ciba's position is that plaintiffs have not proffered sufficiently certain evidence of the extent of their damages.  But that is not a viable basis for summary judgment under Alabama law.  "It is true that damages may be awarded only where they are reasonably certain.  Damages may not be based upon speculation. ... The rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent.  If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery."  *Systrends, Inc. v. Group 8760, LLC*, 959 So.2d 1052, 1076 (Ala. 2006) (quoting *Jamison, Money, Farmer & Co., P.C. v. Standeffer*, 678 So.2d 1061, 1067 (Ala. 1996)); *see also Mannington Wood Floors, Inc. v. Port Epes Transport, Inc.*, 669 So.2d 817, 822 (Ala. 1995) ("the uncertainty which prevents a recovery is uncertainty as to the *fact* of the damage and not as to its *amount*") (citation omitted).  Here, plaintiffs have offered specific evidence of damage or loss or harm suffered.  That there may be some uncertainty as to the magnitude of that harm does not, as a matter of law, bar plaintiffs from prosecuting their property damage claims at trial.

Two other points from the summary judgment briefing bear mention.  First, in their reply brief, defendants argue for the first time that "the nuisance claims of Byrd, McIntyre, Fisher and Reed fail, and the Defendants are entitled to a summary judgment on those claims."  (Reply Brief (doc. 537), at 7.)  This argument is nowhere to be found in the underlying Motion for Summary Judgment and supporting brief.  The Motion and brief make clear that defendants are seeking summary judgment solely on the basis that plaintiffs failed to prove injury to their properties, yet in their reply brief defendants would unveil a new argument that four plaintiffs' nuisance claims should be dismissed for want of evidence of loss of use and enjoyment of their property.  As the parties have been reminded previously, it is improper to raise new arguments in a reply brief or to recast a motion as something else in the movant's final briefing opportunity, after it is too late for the nonmovant to respond.  *See, e.g., Fisher*, 238 F.R.D. at 317 n.89 ("this

---

[17]     To the extent that defendants balk that the estimates for the extent of diminution in value from plaintiff to plaintiff do not correlate closely with the actual DDTr contamination levels at each property, that line of argument may prove a fruitful avenue for cross-examination or closing argument, but it is not a valid basis for excluding the evidence altogether.

argument is not properly raised because plaintiffs submitted it for the first time in their reply brief").  The Court therefore declines to consider this issue as presented by defendants.

Second, defendants also assert in their reply brief that plaintiffs' failure to controvert certain of Ciba's proposed findings of fact and conclusions of law means that they should be "accepted as true and correct by this Court for purposes of the trial" and "should become the law of the case going forward."  (Reply Brief, at 14.)  Of course, there may be many reasons why a nonmovant may elect not to controvert certain proposed findings of fact and conclusions of law, not the least of which is the nonmovant's belief that certain of those findings and conclusions need not be reached in order to defeat the motion.  For the Court to hold that a party's failure to lodge explicit objections to each and every finding of fact and conclusion of law proposed by the other side is tantamount to a stipulation that will be binding on the party for the duration of the case would have no basis in the Federal Rules of Civil Procedure, and would create perverse incentives for summary judgment litigants to quibble over trivial or extraneous issues that have no bearing on the summary judgment ruling as a means of jockeying for position at trial.  Given the burgeoning volume of briefing and evidentiary submissions in federal summary judgment practice, the Court declines to adopt a rule that would swell those filings further.  This is precisely what would happen if courts penalized nonmovants for failing to brief ancillary matters by deeming their silence to be tantamount to a stipulation to those matters.  As previously explained, the parties' proposed Pretrial Order governs the disputed and undisputed issues of fact and law at trial.  Ciba's proposed findings of fact and conclusions of law are neither a substitute for nor a complement to that document.

## III.   Defendants' Motion on Fraud, RICO (doc. 405).

Defendants' second motion for summary judgment seeks dismissal of plaintiffs' fraud and civil RICO causes of action on the ground that "Plaintiffs have not brought forth any evidence that they heard or relied upon misrepresentations or any representations by defendants."  (Motion for Partial Summary Judgment (doc. 405), at 1.)[18]  Plaintiffs counter that

_____

[18]    The Motion also requests entry of judgment on plaintiffs' claims for misrepresentation and unjust enrichment.  Although misrepresentation claims are recited in the Fourth Amended Class Action Complaint (doc. 400) as the Sixth and Seventh Causes of Action, there is no claim for unjust enrichment.  Moreover, the joint proposed Pretrial Order (doc. 534),

there is ample evidence of record that plaintiffs relied on misrepresentations by Ciba representatives to their detriment.  This Motion is now ripe for disposition.[19]  Curiously, the Motion is confined to the claims of plaintiffs McIntyre, Reed, Byrd and Fisher, and excludes the claims brought by plaintiff Greer.  This outcome is directly traceable to defendants' strategic decision to file their Rule 56 Motion before waiting for discovery to reach a sufficiently advanced stage that all plaintiffs' claims could be addressed in a single motion.  Nor have

---

which constitutes the parties' final statement of the issues joined for trial in this action, identifies neither misrepresentation nor unjust enrichment causes of action.  Therefore, the Court finds that plaintiffs' claims for misrepresentation and unjust enrichment are not part of this case.  Insofar as defendants seek summary judgment on these nonexistent claims, the Motion for Partial Summary Judgment is **moot**.

[19]    One procedural idiosyncrasy pertains to this Motion.  Defendants filed it on November 17, 2006, several months before the April 2007 discovery deadline.  Plaintiffs filed a lengthy response with more than 20 exhibits on December 15, 2006.  Although that response addressed the Motion's merits at length, buried amidst the brief and exhibits were plaintiffs' Rule 56(f) objection and attorney affidavit, wherein they protested that defendants' Motion was premature because discovery had not yet concluded.  Plaintiffs did not file a freestanding Rule 56(f) motion for enlargement of time or otherwise notify the Court of the pendency of this issue. Because of that omission, briefing was carried out in accordance with the court-ordered briefing schedule, with no special allowance for any Rule 56(f) issues.  Nor have plaintiffs made any attempt to supplement their briefing at any time following their December 15, 2006 opposition brief, based on information gleaned from discovery in the interim.  Moreover, review of the Rule 56(f) affidavit reveals that plaintiffs have failed to show that they "cannot for reasons stated present by affidavit facts essential to justify [plaintiffs'] opposition."  Rule 56(f), Fed.R.Civ.P. That affidavit alleged that there was "a modest amount of discovery" outstanding, including a Rule 30(b)(6) deposition concerning Ciba's DDT production, ongoing sampling analysis and expert reports, and the like, but did not show how any of this information would be germane to the narrow issue raised in Ciba's motion for summary judgment.  *See Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843-44 (11th Cir. 1989) ("The party seeking to use [R]ule 56(f) may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but rather he must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.").  Nor is counsel's conclusory statement that two plaintiffs were "unavailable" to provide affidavits sufficient, in the absence of any explanation for why they were unavailable, when they were expected to become available, what information would be elicited by affidavit, and the like.  In any event, plaintiffs never sought to supplement the summary judgment record or briefing concerning this motion.  For all of these reasons, plaintiffs' Rule 56(f) objection to the Motion for Partial Summary Judgment is **overruled**.

-18-

defendants filed a supplemental motion or made any attempt to bring Greer's claims within the ambit of this particular Motion for Partial Summary Judgment; therefore, the Court cannot assess the viability of Greer's fraud and RICO claims (even though it is doing so with respect to identical claims brought by the other four plaintiffs) because defendants have not placed that issue before it.  The resulting inefficiencies guarantee duplication of effort by both the Court and the parties.

### A.    *Record Facts.*

Viewed in the light most favorable to plaintiffs, the record on this issue consists primarily of plaintiffs Fisher, Byrd, and McIntyre's statements in their interrogatory responses concerning whether they had heard any Ciba representative make any statements relating to their claims.[20] In particular, Interrogatory #7 asked each plaintiff to provide information concerning "any statement made by Defendants (or any of Defendants' present or former employees, consultants, agents, or other representatives) regarding any event alleged in the Complaint" of which that plaintiff was aware.  (Doc. 405, at Exhs. B-E.)  Plaintiff McIntyre responded as follows: "I am not aware of any such statements being made by anyone who worked for or was affiliated with CIBA."  (*Id.* at Exh. B-C.)[21]  Plaintiff Byrd responded that she had attended "a CIBA town meeting" sometime "[i]n the early 1990's" at which Ciba representatives made assurances "that CIBA was a safe and environmentally friendly plant."  (*Id.* at Exh. D.)  Byrd further stated that she periodically had received mailings from Ciba "regarding how safe and clean the plant was."

---

[20]    Defendants neglected to include in the record copies of the relevant interrogatories concerning plaintiff Reed, but instead submitted copies of the McIntyre interrogatory responses as both Exhibit B and Exhibit C in support of their Motion.  While this omission appeared to result from a clerical error, the fact remains that the record lacks the relevant pages from the Reed interrogatories on which movants rely.  The Court must examine the Rule 56 Motion based on the record actually presented, rather than one that may have been intended or desired had movants submitted the proper exhibits.

[21]    McIntyre's response echoes his courtroom testimony during the class certification hearing.  At that hearing, defense counsel asked McIntyre on cross-examination whether he was "aware of any statement by anyone who was affiliated with Ciba related to any allegation of contamination."  McIntyre answered, "Not that I know of, no."  (Doc. 381, at 215.)  When asked whether he had had "any communication with the defendants or any representatives of the defendants regarding contamination," McIntyre again responded, "No."  (*Id.*)

(*Id.*)  And plaintiff Fisher responded as follows: "I am unaware of any such statements made by the defendants or employees thereof. ... I do not have any personal or firsthand knowledge of anything representatives of the defendants may have stated at the meetings."  (*Id.* at Exh. E.)

Plaintiffs offer no supplemental evidence concerning Fisher's knowledge of or reliance on any alleged fraudulent statements by Ciba or its agents; however, they do submit additional evidence concerning the other three affected plaintiffs.  In her deposition, Reed testified that she was told "[i]n the community" that it was "okay to eat the fish" caught locally.  (Doc. 418, Exh. C, at 116-17.)  When asked if "representatives from either Olin or Ciba" had talked to the "community" about fish, Reed answered affirmatively and testified, "They said it was all right to eat fish."  (*Id.* at 117-18.)[22]  In response to leading questions from her attorney, Reed testified that whenever the newspaper published negative stories about Olin or Ciba, there were also "other articles that said it was okay."  (*Id.* at 122.)  Reed also indicated that she had received a letter from Olin (not Ciba) "that they had wrote [her] and told [her] that everything was fine." (*Id.*)[23]

Plaintiff Byrd testified in her deposition about the "town meeting" mentioned in her interrogatory response.  According to Byrd, she attended several meetings at which Ciba representatives were "letting us know about the safety and the environment, how it was supposed to be safe and nothing's being destroyed."  (Doc. 418, Exh. D, at 19-20.)  Byrd recounted a meeting that she attended two years ago, at which Ciba employees stated that "everything is safe and everything's in environmental range."  (*Id.* at 22-23.)  Ciba employees "would go over everything and reassure us, you know, that everything is safe and what they make and just

---

[22]    The "they" was never identified with greater specificity in the Reed deposition excerpts found in the summary judgment record.

[23]    That letter was apparently not included in the summary judgment materials submitted by plaintiffs.  The only letter to the community at large contained in plaintiffs' record materials is a "Dear Neighbor" letter from August 1996 that merely described in broad terms Ciba's ongoing clean-up efforts at their site, with no representations about whether any community member's property might or might not be contaminated.  (Doc. 419, Exh. Q.)  It does not appear that any statements in the August 1996 letter could form the basis of a viable fraud claim, even assuming that plaintiffs had received and relied on it (which plaintiffs have not shown, at any rate).

mostly about their plant." (*Id.* at 24.) Byrd testified that Ciba employees had distributed written materials to Byrd and others stating that "it meets the environmental code of being safe." (*Id.* at 27.) Further, Byrd indicated that her family no longer engaged in gardening on their property because of "the pollution of mercury" (not DDT, the contaminant at issue in this case) and "[t]he environmental department"'s guidance in 2003 that they not grow food there. (*Id.* at 93-94.) With respect to fishing, Byrd's testimony is that she fished in the Tombigbee River and other local creeks and ponds until 2003, when fishing was banned in those areas. (*Id.* at 96.) In response to leading questions from counsel, Byrd stated that she wanted to believe that Ciba's plant was safe, and that Ciba officials had told her on numerous occasions that it was safe. (*Id.* at 115-16.) Byrd agreed with her counsel that she had relied on information provided by Ciba that the plant's operations posed no danger to the neighboring community. (*Id.* at 122-23.)

Concerning plaintiff McIntyre, plaintiffs do not offer any deposition excerpts, but they do present a sworn, notarized affidavit from McIntyre dated December 14, 2006. (Doc. 420, Exh. V.) McIntyre's affidavit states that he "received letters in the mail from Ciba ... over the years. The letters always said that everything was safe in the McIntosh community." (*Id.*, ¶ 2.) The affidavit also includes a statement that McIntyre received second-hand reports that Ciba had "said everything was safe" at community meetings, none of which McIntyre attended. (*Id.*, ¶ 3.) Finally, McIntyre avers that "the word I always heard wass [*sic*] that the Ciba-Geigy and government officials always said that everything in town was safe." (*Id.*, ¶ 4.) Although they filed no formal motion to strike, defendants object that the McIntyre affidavit is a "transparent attempt to change the prior sworn testimony." (Doc. 426, at 2.) The Court agrees; indeed, the December 2006 McIntyre Affidavit epitomizes the type of "sham affidavit" condemned by the Eleventh Circuit in *Van T. Junkins*, *McCormick* and the like. In 2004, McIntyre submitted interrogatory responses in which he unequivocally denied awareness of any statements by any Ciba representative "regarding any event alleged in the Complaint," which plainly includes the risk of contamination by Ciba into the McIntosh community. (Doc. 405, Exh. B, at #7.) In April 2006, McIntyre testified under oath at a class certification hearing that he was "not aware of any statement by anyone who was affiliated with Ciba related to any allegation of contamination." (Doc. 381, at 215.) But in a summary judgment affidavit dated December 2006, McIntyre abruptly turns 180 degrees, averring that he had received letters from Ciba "over the years"

assuring him that "everything was safe in the McIntosh community" and that he had been told by friends and family members after various community meetings that Ciba had provided assurances that "everything was safe."  (Doc. 420, at Exh. V.)  The Court finds an inherent, fundamental inconsistency between the McIntyre Affidavit and his prior sworn testimony. Plaintiffs having made no attempt to explain the sudden about-face, the Court **strikes** the McIntyre Affidavit dated December 14, 2006 pursuant to the Eleventh Circuit's "sham affidavit" rule.  The averments made in that plainly improper affidavit will not be considered in the summary judgment analysis.

       ***B.***     ***Analysis.***

          1.     *Plaintiffs' Fraud Claims.*

Under Alabama law, "[t]he elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation."  *Mantiply v. Mantiply*, 951 So.2d 638, 653 (Ala. 2006) (citation omitted); *see also Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 788 (Ala. 2006) (similar); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) ("plaintiffs' fraud claims generally require a showing that defendants made a false representation concerning a material fact, that defendants knew the statement was false or made it in reckless disregard for its truth or falsity, that the plaintiff reasonably relied upon such statement, and that the plaintiff was damaged by virtue of such reliance").  Defendants' motion for summary judgment focuses on the "reasonable reliance" and "injury" elements.  In a nutshell, defendants' position is that none of the plaintiffs have shown that they heard or relied on any allegedly false statements by Ciba and, even if they had, no plaintiffs have shown that they suffered damage as a result of that reliance.

Alabama law is clear that "[r]easonable reliance is an essential element of a misrepresentation claim."  *Alabama Elec. Co-op, Inc. v. Bailey's Const. Co.*, 950 So.2d 280, 283 (Ala. 2006); *see also Allstate Ins. Co. v. Eskridge*, 823 So.2d 1254, 1264 (Ala. 2001) (fraud claim requires proof by substantial evidence that plaintiff "reasonably relied on the alleged misrepresentation").  "Reliance requires that the misrepresentation actually induced the injured party to change its course of action."  *Hunt Petroleum Corp. v. State*, 901 So.2d 1, 4 (Ala. 2004). "If [the plaintiff] would have adopted the same course irrespective of the misrepresentation and

would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor." *Id.* (quoting *Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So.2d 601, 611 (Ala. 1980)). Thus, "for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." *Id.* at 5.

Careful inspection of the record reveals that none of the four plaintiffs to whom the motion is directed can satisfy the reasonable reliance standard. Plaintiffs Fisher and McIntyre have unequivocally denied awareness of any statements made by anyone who worked for or was affiliated with Ciba regarding any of the events at issue in this litigation. (Doc. 405, at Exhs. B, E.) It is axiomatic that a plaintiff cannot show reliance (reasonable or otherwise) on a statement of which he or she is unaware. Confronted with this inexorable truth, plaintiffs point to evidence of knowledge by Reed and Byrd, which of course is ineffective to rebut the unambiguous discovery responses of Fisher and McIntyre.[24] Nor is it effective for plaintiffs simply to point to a litany of alleged misrepresentations made by Ciba to various other persons at various other times. (Plaintiffs' Exhs. G, I - T.) Construed in the light most favorable to plaintiffs, these exhibits may well support an inference that Ciba disseminated false information to government officials, news outlets and the general public; however, they do not establish the requisite nexus between those alleged false statements and plaintiffs Fisher and McIntyre, who have professed ignorance of such statements. If (as the record plainly shows) Fisher and McIntyre were unaware of the misrepresentations, then it is of no consequence how many misrepresentations Ciba made or how egregious they were. Plaintiffs having come forward with no evidence tending to show that Fisher and McIntyre were aware of any alleged misrepresentations by Ciba

---

[24] In their opposition brief, plaintiffs also direct the Court's attention to "Exhibits J, K, L, M and N, Affidavits of Plaintiffs, William McIntyre, Barbara Byrd, Alrean [*sic*] Reed, Jessie Fisher, and Sharon Greer, respectively." (Doc. 418, at 9-10.) But no affidavits from plaintiffs are found at those exhibit letters. (*See* doc. 419, at Exhs. J-N.) Such false trails serve only to complicate the Court's task in assembling and applying record facts. More to the point, the only record evidence as to Fisher and McIntyre's knowledge of defendants' purported misrepresentations consists of their own interrogatory responses and McIntyre's live testimony, in which they categorically disclaim any such awareness.

or its representatives relating to any issues in this case, those two plaintiffs' fraud claims fail as a matter of law.

As for plaintiffs Reed and Byrd, they have presented evidence that arguably supports an inference that they were aware of misrepresentations made by Ciba concerning the risks and prevalence of DDT contamination in the McIntosh community.  Assuming (without deciding) that they have satisfied that evidentiary threshold, where is the reliance?  Without evidence that they took a different course of action because of Ciba's misrepresentations, Reed and Byrd's fraud claims are not sustainable, as a matter of law.  *See Hunt*, 901 So.2d at 4-5.  In their brief, plaintiffs' counsel repeatedly asserts that the reliance element is satisfied because they "were induced to their detriment into remaining within the surrounding community."  (Plaintiffs' Brief (doc. 418), at 9, 11.)[25]  However, this argument is lacking any record foundation.  There is no evidence that Reed and Byrd would have relocated from McIntosh, or at least moved a greater distance from the Ciba plant, but for Ciba's alleged misrepresentations.  Plaintiffs have made no showing that Reed and Byrd would have done anything differently in the absence of the alleged misrepresentations by Ciba (*e.g.*, Reed's testimony that "they" told her it was okay to eat fish and that "other articles said it was okay," Byrd's statements that she attended meetings at which Ciba officials provided assurances that "everything was safe").[26]  There being no record evidence that Reed or Byrd took a different course of action because of Ciba's alleged misrepresentations

_____

[25]     The joint proposed Pretrial Order similarly reflects that plaintiffs' theory of reliance is exclusively that "Plaintiffs reasonably relied on those communications [from Ciba] and thereby were induced to their detriment into remaining within the surrounding community."  (Doc. 534, at 23.)

[26]     In fact, the record undercuts any inference of reliance.  At her May 2005 deposition, Byrd testified that she and her family had never discussed selling their property because "we don't want to sell.  That's sort of like a family heirloom, I guess."  (Doc. 405, Exh. F, at 39.)  Similarly, when asked in her May 2005 deposition whether she had given any thought to moving away because of the contamination, Reed responded, "Moving?  No sir, not really."  (Doc. 405, Exh. I, at 107.)  Reed expressly denied having ever thought about selling her property and moving away from McIntosh.  (*Id.*)  That Byrd and Reed had no interest in leaving their community even after suing Ciba for contaminating their property and making false representations to them concerning such contamination is powerful evidence that they were not coaxed into remaining in the community by those alleged misrepresentations.

(*i.e.*, that they would have moved out of the area if not for their reliance on Ciba's statements), their fraud claims cannot proceed, as a matter of law.

>    2.    *Plaintiffs' RICO Claims.*

To state a claim under civil RICO, a plaintiff must allege each of the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000); *see also General Cigar Co. v. CR Carriers, Inc.*, 948 F. Supp. 1030, 1034 (M.D. Ala. 1996) (same).  Where, as here, a plaintiff seeks to advance a RICO claim predicated on mail and wire fraud, the Eleventh Circuit has catalogued the elements that the plaintiff must prove as follows: "(1) that the defendant intentionally participated, (2) in a scheme to defraud, (3) the plaintiff of money or property, (4) by means of material misrepresentations, (5) using the mails or wires, (6) and that the plaintiff relied on a misrepresentation made in furtherance of the fraudulent scheme, (7) that such misrepresentation would have been relied upon by a reasonable person, (8) that the plaintiff suffered injury as a result of such reliance, and (9) that the plaintiff incurred a specifiable amount of damages."  *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1360-61 (11th Cir. 2002) (footnotes omitted).

Plaintiffs' RICO claim turns on predicate offenses of alleged mail fraud.  (Pretrial Order (doc. 534), at 33-34.)  A plaintiff who brings a civil RICO claim predicated on mail fraud must show, among other things, "that he was a target of the scheme to defraud and that he relied to his detriment on misrepresentations made in furtherance of that scheme."  *Sikes*, 281 F.3d at 1360 (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1499-1500 (11th Cir. 1991)).  RICO claims predicated on mail fraud are not cognizable where the plaintiff fails to show reasonable reliance on misrepresentations.  Indeed, "to establish a RICO fraud claim Plaintiffs must make the same showing of reasonable reliance that is required for establishing common law fraud."  *Green Leaf Nursery v. E.I. Dupont De Nemours and Co.*, 341 F.3d 1292, 1306 (11th Cir. 2003).  In that regard, the Eleventh Circuit has cautioned that "reliance may not be presumed in fraud-based RICO actions; instead the evidence must demonstrate that each individual plaintiff actually relied upon the misrepresentations at issue."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1257 (11th Cir. 2004).

As with the fraud claims discussed *supra*, this reliance requirement erects an insuperable

hurdle to the RICO causes of action pursued by plaintiffs Fisher, McIntyre, Byrd and Reed. Fisher and McIntyre were unaware of any misrepresentations by Ciba, and therefore could not have relied on them.  Byrd and Reed identify misrepresentations (including certain statements from Ciba received in the mail) but fail to proffer any evidence that they actually relied on them. Plaintiffs' sole theory of reliance is that the alleged misrepresentations induced plaintiffs to continue living in McIntosh, but there is no evidence that Byrd and Reed would have moved away in the absence of Ciba's purportedly false statements.  Under *Green Leaf*, if plaintiffs have not made a sufficient showing of reliance to establish common law fraud, then they likewise cannot establish a RICO fraud claim.  As such, plaintiffs' RICO theory of liability cannot survive summary judgment scrutiny because of precisely the same reliance defects that proved fatal to their state-law fraud claims.

**IV.   Defendants' Motion on Claims of William McIntyre (doc. 406).**

Defendants' third summary judgment is confined to the claims of a single plaintiff, William McIntyre, and seeks dismissal of all of his claims on timeliness grounds.  Defendants contend that they are entitled to summary judgment under both Alabama's rule of repose and the applicable statutes of limitation.[27]

**A.   *Analysis of Rule of Repose Argument.***

Defendants first assert that McIntyre's claims are barred by Alabama's rule of repose because they are based on events that occurred more than 20 years ago.

Going back as far as 1858, Alabama courts have recognized a judicially created rule of repose that erects an absolute bar to claims arising from events more than 20 years old.  *See Ex parte Liberty Nat. Life Ins. Co.*, 825 So.2d 758, 763 (Ala. 2002); *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1213-14 (11th Cir. 2001) (stating that "it is clear that any claim in Alabama courts, brought more than twenty years after the time when it first could have been, is barred if

---

[27]   Defendants do not explain why their Rule 56 Motion is limited to the claims of plaintiff McIntyre or why it excludes the other four plaintiffs.  Presumably, the timeliness arguments that defendants interpose with respect to McIntyre (or some variant of same) are equally applicable to the claims of the other four plaintiffs.  Once again, defendants place legal issues before this Court for resolution in a piecemeal fashion, to the detriment of efficiency and judicial economy.

the rule of repose applies"). Alabama's rule of repose is both unforgiving and inflexible. Its only element is time. *See Boshell v. Keith*, 418 So.2d 89, 91 (Ala. 1982); *Liberty*, 825 So.2d at 764 (noting that "the rule is based solely upon the passage of time"). Indeed, the rule "is not affected by the circumstances of the situation, by personal disabilities, or by whether prejudice has resulted or evidence obscured." *Boshell*, 418 So.2d at 91. Concepts of notice or discovery of the injury have no place in Alabama's rule of repose analysis; rather, the 20-year period runs without regard to when the plaintiff received notice of the claim. *See Liberty*, 825 So.2d at 764; *Moore*, 267 F.3d at 1218. Where the rule of repose applies, its time period begins to run when the complained-of action occurs, not when the claim might otherwise accrue. *Moore*, 267 F.3d at 1218.

More than three years ago, this Court considered and rejected defendants' rule of repose argument in this very case. On July 20, 2004, the undersigned entered an Order (doc. 56) finding that Alabama's rule of repose was preempted by the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), which provides, in part, as follows:

> "In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, ***if the applicable limitations period for such action (as specified in the State statute of limitations or under common law)*** provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute."

42 U.S.C. § 9658(a)(1) (emphasis added). The "federally required commencement date" ("FRCD") is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4); *see also Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F. Supp. 1116, 1126 (N.D. Fla. 1995) (trigger for FRCD is when plaintiff became aware of the fact of contamination, and it is not necessary that the plaintiff know the identity of every specific pollutant involved). If § 9658 applies, its preemptive effect causes the time period for Alabama's rule of repose to begin running not when the harmful action occurred (*i.e.*, when Ciba released DDT into the community), but rather when plaintiffs

-27-

knew or reasonably should have known that Ciba's actions had damaged their property.  The July 20, 2004 Order held that the criteria of § 9658(a)(1) were satisfied in this case and "that § 9658(a)(1) **preempts** the commencement date of the Alabama rule of repose."  (Doc. 56, at 20.)

Defendants now ask the Court to revisit the July 20, 2004 Order, reasoning that it has been undermined by subsequent precedent from other jurisdictions.  Defendants rely on *Burlington Northern & Santa Fe Ry. Co. v. Poole Chemical Co.*, 419 F.3d 355 (5ᵗʰ Cir. 2005).  In *Burlington*, the Fifth Circuit determined that CERCLA's FRCD did not preempt a Texas statute of repose, based on a straightforward exercise in statutory interpretation.  The *Burlington* court explained that "[t]he plain language of § 9658 ... refers to state statutes of limitations - not state statutes of repose.  This court is bound by that plain language, absent express congressional intent to the contrary.  Congress did not express a contrary intent in this instance."  419 F.3d at 364 (footnote omitted).  Defendants contend that *Burlington* should prompt the Court to reconsider its previous determination that the commencement date for Alabama's rule of repose is preempted by § 9658.[28]  Plaintiffs respond that, on its face, *Burlington* is distinguishable.  Unlike the case at bar, *Burlington* concerned application of a state <u>statute</u> of repose, rather than a state <u>rule</u> of repose.  Section § 9658 provides that the FRCD preempts limitations periods set by "the State statute of limitations or under common law."   *Burlington* seized on this statutory language to note that Congress spoke of statutes of limitations but omitted reference to statutes of repose.  Here, however, there is no statute of repose, but there is instead a rule of repose created by Alabama common law.  Under the plain language of § 9658, Congress intended the FRCD to be afforded primacy over limitations periods set by state common law.  What is Alabama's rule of repose if not a limitations period prescribed by state common law?  As such, plaintiffs contend, *Burlington* is not inconsistent with this Court's prior ruling, and in no way warrants disturbing that ruling three years after the fact.  Defendants offer no rejoinder to plaintiffs' distinction of *Burlington* from the case at bar; indeed, they eschew any discussion of the rule of repose issue in their reply brief.  This Court will not undertake to articulate

_____

[28]      Defendants also cite *McDonald v. Sun Oil Co.*, 423 F. Supp.2d 1114 (D. Or. 2006), which simply followed the *Burlington* analysis in determining that CERCLA did not preempt Oregon's statute of repose.

defendants' arguments for them.  In light of plaintiffs' unrebutted, persuasive contention that *Burlington* has no application in the context of a common-law rule of repose, and given the clear language of § 9658 applying the FRCD to limitations periods set by common law, the Court declines defendants' invitation to overturn its prior determination that the FRCD provides the commencement date for Alabama's rule of repose in this case.[29]

###### B.    *Analysis of Statute of Limitations Argument.*

####### 1.    *Legal Standard for Triggering of FRCD.*

Ciba also maintains that it is entitled to summary judgment on McIntyre's claims on statute of limitations grounds.  The fraud and RICO claims brought by McIntyre having already been dismissed for want of evidence of reasonable reliance, his only remaining causes of action sound in negligence, nuisance, strict liability, and trespass (doc. 534, at 15-38).  These claims are subject to limitation periods of either two (negligence, nuisance, strict liability) or six (trespass) years under Alabama law.[30]  As to these claims, the parties are in agreement that the applicable limitations periods commence running with the FRCD, which is defined in CERCLA as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages ... were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."  42 U.S.C. § 9658(b)(4).  (Doc. 406, at 12; doc. 421, at 13.)  "Thus, the critical legal inquiry for purposes of establishing when the limitations period began to run for plaintiff [McIntyre] is when [he] 'reasonably should have known' that [his] property had been damaged

---

[29]    Additionally, the Court observes that *Burlington* is not binding precedent and that it does not represent the unanimous view of courts and commentators, even in the statute of repose context.  *See, e.g., A.S.I., Inc. v. Sanders*, 835 F. Supp. 1349, 1358 (D. Kan. 1993) (collecting cases that have treated statutes of limitations and statutes of repose identically for purposes of § 9658 preemption, and noting paucity of cases to the contrary); J. O'Reilly and C. Broun, 1 *RCRA and Superfund: A Practice Guide, 3d* § 9:157 (2007) ("CERCLA § 309 applies to preempt a state statute of repose.").

[30]    *See* Ala. Code § 6-2-38(*l*) (setting catch-all two-year limitations period for non-enumerated claims for injury to person or rights of another); *Saxton v. ACF Industries, Inc.*, 239 F.3d 1209, 1212 (11th Cir. 2001) ("Under Alabama law, the statute of limitations for general tort claims is two years."); Ala. Code § 6-2-34(2) (explaining that "[a]ctions for any trespass to real or personal property" are subject to six-year limitation period); *Motisi v. Alabama Gas Corp.*, 485 So.2d 1157, 1158 (Ala. 1986) ("Trespass actions are barred after six years.").

by industrial contamination from the [Ciba] site." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 654 (S.D. Ala. 2005).

    As reflected by the statutory language, the "reasonably should have known" requirement is an "objective standard for accrual" based not on what a plaintiff actually knew, but what he reasonably should have known. *See Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 198 (2d Cir. 2002) (FRCD is triggered "if there was sufficient information that a plaintiff reasonably should have known the cause of the injury earlier than he actually knew"). This standard requires less than actual knowledge, but more than "mere suspicion, whatever its reasonableness." *Id.* at 205-06; *see also O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1148 (9th Cir. 2002) ("the federal standard requires more than suspicion alone"). In applying the FRCD's "reasonably should have known" standard, courts apply a two-pronged test. First, they assess "whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury." *O'Connor*, 311 F.3d at 1150. If the plaintiff was on inquiry notice, then courts consider whether such inquiry "would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim," and charge plaintiff with knowledge of facts that would have been discovered through that process. *Id.* The law is clear that the "reasonably should have known" test for the FRCD "does not permit a party to await certainty." *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 932 (6th Cir. 2004) (when plaintiff knew that defendant had released chemicals and that chemicals were present in plaintiff's water supply, it knew or should have known of its cause of action). A plaintiff "must be diligent in discovering the critical facts. As a result, a plaintiff who did not actually know that his rights were violated will be barred from bringing his claim after the running of the statute of limitations, if he should have known in the exercise of due diligence." *Bibeau v. Pacific Northwest Research Foundation Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999).

    2.    *Application of FRCD to Record Facts Concerning McIntyre.*

    Defendants insist that McIntyre was on sufficient inquiry notice of the contamination of his property by Ciba long before the Complaint was filed. In support of their position, defendants look to McIntyre's testimony. During the class certification hearing, McIntyre testified that when the wind blew in a certain direction on a foggy morning, he "could smell the chemical," and that he could see "[c]hemical or fog or something falling on" his property. (Doc.

381, at 206.)[31]  According to McIntyre, "some of the chemical plant people" tested his property's well water on one occasion "a long time" ago.  (*Id.* at 216.)  He stated that he recalls the river being closed to fishing in the 1970s because of contamination, and that he remembers fish advisories in the 1990s wherein fisherman such as McIntyre were advised to avoid fishing in certain areas.  (*Id.* at 216, 218.)  McIntyre acknowledged that he stopped fishing in certain areas because he was concerned about contamination.  (*Id.* at 219.)  McIntyre further testified that had heard talk of a citizens group formed in McIntosh in or around 1996, which group expressed fear of personal injury because of exposure to hazardous chemicals.  (*Id.* at 221-22.)  Although McIntyre never attended any of the group's meetings, he understood from things he heard at the time that the group had asked Ciba to relocate some 300 families as well as McIntosh High School.  (*Id.* at 222-23.)[32]

   In his deposition, McIntyre responded to the question, "How long ago was the first time you remember hearing that they may have some contamination in this area?" by saying that it was in 2003 in connection with a meeting at the town hall, about which he had received second-hand information.  (Doc. 406, Exh. A, at 95, 101.)[33]

---

   [31]   McIntyre did not elaborate his statement about seeing "something falling on" his property, and no follow-up questions were asked.  On this record, then, it is unclear what McIntyre saw or when he saw it.  These missing facts are potentially critical to the limitations analysis, and must be fleshed out at trial.

   [32]   Many of these themes from McIntyre's testimony during the hearing echoed his May 2005 deposition.  Concerning water testing, McIntyre elaborated that personnel from Ciba or Olin (he did not know which) had tested his well water on one occasion more than 10 years earlier, but they "didn't say ... what they was looking for or what they found."  (Doc. 406, Exh. A, at 93.)  McIntyre was clear that he had no information concerning the results of those tests.  (*Id.* at 94-95.)  With regard to river closings in the 1970s, McIntyre testified to his understanding that the closing had been motivated by the presence of mercury in fish.  (*Id.* at 96-97.)  All of McIntyre's knowledge about fish advisories in or near McIntosh prior to 2003 was in connection with "the thing come up about the mercury."  (*Id.* at 100.)  Regarding the odors on foggy mornings, McIntyre testified, "You don't get that good of a smell on them.  You don't know what it is you smell.  But you can tell it's something in the air from the chemicals."  (*Id.* at 103.)

   [33]   Defendants assert in their reply brief that "[t]here is no evidence ... that [McIntyre] never heard anything about contamination until 2003."  (Doc. 425, at 7.)  In light of the above-cited passage from McIntyre's deposition, this objection is without merit.  Of course, defendants also assert that other testimony in his deposition favors an FRCD for McIntyre's

Defendants' argument on summary judgment is that McIntyre was on inquiry notice of the potential for chemical contamination on his property long before this case began.  According to Ciba, the river closing in the 1970s, the fish advisories in the 1990s, the testing of his well water in the 1990s, the formation of the citizens group in the 1990s, and the chemical smell on his property on certain mornings all should have prompted McIntyre to investigate further to determine the nature and cause of his alleged injury, to-wit: the DDTr contamination on his property and the concomitant diminution in property value.  The Court cannot agree, at least not at this stage.  "Courts routinely recognize the fact-intensive nature of the determination of when a plaintiff is on notice of a claim."  *O'Connor*, 311 F.3d at 1150 (internal quotations and citation omitted).  The facts present here can support multiple conflicting inferences.  With respect to the river closing and fish advisories, it might have been reasonable for McIntyre to inquire whether any of this off-site contamination had reached his property, but it might have been equally reasonable for him to assume that the potential presence of mercury in the river did not correlate to any likelihood of chemical contamination on his land.  As for the well water testing, McIntyre's testimony was that no one ever told him what they were looking for or whether they found it.  Was it reasonable of him to assume based on the testers' silence that there was nothing to worry about?  Or should he have initiated an inquiry into the presence of contaminants on his property based on the mere fact that samples were taken from his well?  That is for the fact-finder to decide.  Likewise, the existence of a citizens group complaining about contamination does not necessarily equate to inquiry notice, particularly where McIntyre was not a member of that group and apparently was not well informed as to the specifics of their agenda.  *See Freier*, 303 F.3d at 209-10 ("There is no question that ... there were local concerns and controversies as to whether health problems were being caused by the Pfohl Landfill.  And if notice of controversy were the issue, defendants' motion for summary judgment would have had greater merit.  But that is not the standard for determining the Federal Commencement Date ....").  Finally, a reasonable jury could find that the odor of chemicals wafting over his property when the wind is blowing just right (with something perhaps visibly falling on his property according

claims predating 2003; however, defendants cannot credibly assert that the record is devoid of evidence that McIntyre first heard of contamination in the area in 2003.

-32-

to McIntyre's unclear, undeveloped testimony) would prompt an inquiry by a reasonable person as to whether chemicals were being deposited on his land and, if so, from whence they came. But it could also find otherwise.

In short, defendants are asking the Court to invade the province of the jury and select between conflicting inferences to decide as a matter of law that McIntyre was on inquiry notice of the nature and cause of his injuries more than two or six years before the Complaint was filed. This argument cannot succeed, because the evidence taken in the light most favorable to plaintiffs does not unambiguously show that McIntyre had anything more than a mere suspicion of injury prior to 2003. Mere suspicion, no matter how reasonable, is not enough to trigger the FRCD accrual date for limitations purposes. As one district court aptly stated, "defendants' evidence, viewed as a whole, does lend some weight to their arguments that plaintiffs knew or should have known of their injury and its cause more than [two or six] years before they commenced this action, but the weight of that evidence, and whether it is enough to find plaintiffs' claims time-barred, are for a properly-instructed jury to determine." *Lessord v. General Electric Company*, 258 F. Supp.2d 209, 219 (W.D.N.Y. 2002).[34] Accordingly, the Court finds that Ciba has failed to show that it is entitled to judgment as a matter of law on McIntyre's causes of action. There are simply too many conflicting inferences to pin down with any certainty whether McIntyre was on inquiry notice from the fragmentary clues before him prior to 2001 or 1997 that his property might be contaminated with industrial wastes from the Ciba plant.

**V.      Plaintiffs' Motion concerning Affirmative Defenses (doc. 503).**

The final pending motion is Plaintiffs' Motion for Partial Summary Judgment on Defendants' Affirmative Defenses # 1, 2, 4, 6, 10, 11, 14, 23, 30 and 43 (doc. 503).[35] In their

---

[34]      "[I]t would be inappropriate as a matter of law to find plaintiffs' claims time-barred merely because they did not undertake to ... have their own tests performed to try to ascertain sooner the nature, extent and source of the suspected contamination." *Lessord*, 258 F. Supp.2d at 220.

[35]      Plaintiffs' Motion disregards the requirement of Local Rule 7.2 that motions for summary judgment must be accompanied by suggested determinations of undisputed fact and conclusions of law. When defendants identified this defect in their opposition brief, plaintiffs

Answer to Plaintiffs' Fourth Amended Class Action Complaint (doc. 412), defendants propounded a staggering 46 affirmative defenses. Plaintiffs seek summary judgment as to the following 10 of those defenses: (i) statutes of limitations (Defense #1), (ii) the Alabama rule of repose (Defense #2), (iii) failure to comport with Ala. Code §§ 6-5-120 *et seq.* (Defense #4), (iv) due care and compliance with governmental regulations and standards or good industry practice (Defense #6), (v) preemption by the O.S.H.A. Hazard Communication Standard, 29 C.F.R. § 1910.1200(a)(2) (Defense #10), (vi) the doctrine of accord and satisfaction (Defense #11), (vii) compliance with the state of the art of the industry (Defense #14), (viii) the alleged contamination "involves compounds that are harmless, non-toxic, and incapable of causing actionable property damage" (Defense #23), (ix) res judicata and/or collateral estoppel (Defense #30), and (x) conformity of defendants' products with the state of the art and industry standards (Defense #43). Inasmuch as several of these defenses appear redundant or at least substantially overlapping, they will be grouped together for analytical purposes.

   **A.    *The Statute of Limitations Defense.***

   In litigating defendants' Rule 56 Motion concerning the claims of plaintiff McIntyre, plaintiffs successfully argued that granting summary judgment in defendants' favor on limitations grounds would be inappropriate because "fact-intensive inquiries [in determining when a plaintiff is on notice of a claim] preclude summary judgment." (Doc. 553, at 2.) The same fact-intensive inquiries that plaintiffs contend are necessary to determine when McIntyre knew or should have known of the nature and causes of his alleged property damage are necessary with respect to all plaintiffs. Now, in a drastic shift in position, plaintiffs request entry of summary judgment in their favor on defendants' limitations defense. It is unclear how plaintiffs justify arguing one minute that factual disputes necessitate that the limitations defense go to the jury, and the next that the limitations defense should be taken away from the jury and decided in their favor.

---

made no attempt to rectify or even explain their omission. Such unapologetic noncompliance with the Local Rules would justify summary denial of the motion; nonetheless, in its discretion, the Court will consider the merits of the Motion despite its glaring procedural defect, on the grounds that a ruling on the merits may streamline the issues for trial, facilitate settlement discussions, and/or otherwise assist the parties' trial preparations.

Leaving aside this obvious incongruity, plaintiffs' Motion for Summary Judgment fails on this point because they have failed to identify record facts which they contend should give rise to summary judgment on the limitations defense.  The law is clear that "[t]o prevail on a summary judgment motion, the moving party carries the initial burden of demonstrating to the court that no genuine issue of material fact exists."  *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001) (citation omitted).  Yet plaintiffs' motion and brief recite no evidence but simply offer conclusory, unsubstantiated generalizations that plaintiffs were not aware prior to 2003 that this property had been damaged or devalued by Ciba's activities, and that defendants have not proven otherwise.[36]

Furthermore, the record demonstrates the existence of substantial questions of material fact concerning when plaintiffs were first on inquiry notice.[37]  In § IV.B.2., *supra*, the Court has explained how conflicting inferences may be drawn from the evidence relating to plaintiff McIntyre.  The same kinds of inferences are also present with respect to the other plaintiffs.  For instance, the record evidence that Ciba contamination received substantial media attention during much of the period of concern raises a question of fact as to whether that knowledge can be imputed to plaintiffs.[38]  Plaintiff Byrd testified that she had attended Ciba safety meetings dating

---

[36]    Plaintiffs did offer some evidence pertaining to the limitations question in their reply brief; however, plaintiffs have not made any showing as to why they did not submit those record excerpts along with their Rule 56 motion, so that Ciba could have been afforded an opportunity to respond.  It is improper to omit evidence with a summary judgment motion that simply characterizes the record in conclusory terms, then to submit previously available evidence on a reply brief, after it is too late for the nonmovant to be heard in response.  *See, e.g., Sweet v. Pfizer*, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("the moving party in a motion cannot submit new information as part of its Reply").

[37]    Plaintiffs frame their summary judgment argument on the limitations defense as follows: "The fact is that Plaintiffs' properties were contaminated by the actions of Defendants, and Plaintiffs found out about this contamination well within the statute of limitations period." (Doc. 535, at 4.)  This contention misstates the legal standard for accrual of plaintiffs' claims under the FRCD.  It does not matter when plaintiffs "found out" about alleged contamination on their properties, as the FRCD accrual standard is objective, not subjective.  *See* Section IV.B.1., *supra*.

[38]    Plaintiffs acknowledged as much in seeking to overcome defendants' summary judgment motion on the McIntyre claims, citing federal appellate authority for the proposition

back as far as 1996, and that she had heard that Ciba had dumped wastes off-site as early as 1993.  (Doc. 528, Exh. C at 9, 18-19.)[39]  Plaintiff Reed, like McIntyre, testified to the presence of a strong odor on her property dating back many years that she attributed to the local chemical plants.  (*Id.*, Exh. D at 90-91.)  Plaintiff Fisher testified that she had heard people in the community talking about health hazards from Ciba's activities (although the date was not established in the excerpt provided), which made her "want to ask questions about how it affected [her] property."  (*Id.*, Exh. E at 37.)  She apparently failed to ask such questions until years later.  Viewing this incomplete record in the light most favorable to nonmovants, the Court cannot conclude as a matter of law that the FRCD for plaintiffs' causes of action for alleged contamination to their properties based on Ciba activities several decades ago did not predate 2001 (negligence, nuisance, strict liability) or 1997 (trespass).  Therefore, plaintiffs' Motion for Partial Summary Judgment as to defendants' First Affirmative Defense (statute of limitations) is **denied**.[40]

### B.    *The Rule of Repose Defense.*

Next, the parties rehash their arguments concerning the applicability of Alabama's rule of repose.  Having now ruled on two separate occasions in this action that the commencement date of Alabama's rule of repose is preempted by CERCLA's federally required commencement date,

---

that whether media reports would have placed plaintiffs on notice that defendants' contamination caused their injury "is fundamentally a question of fact."  (Doc. 553, at 4.)  Once again, plaintiffs rely on these arguments when they suit their purpose, then discard them to take an inconsistent position in their subsequent motion.

[39]      Rather than providing excerpts from Byrd's official deposition transcript, defendants submit what appears to be an unformatted text file version of the transcript.  Although the Court will consider this exhibit in the manner that it was filed, defendants are reminded that discovery materials should be filed in their official, certified form.  Uncertified, draft transcripts should not be filed in any proceeding in this District Court, and are subject to being stricken.

[40]      That said, and particularly given movants' failure to flesh out the record on this point, the Court will scrutinize the evidence carefully at trial to ascertain whether it is subject to conflicting reasonable inferences on the question of when plaintiffs knew or should have known of the alleged contamination by Ciba on their property, and will entertain argument on any Rule 50 motion raised at an appropriate time.

on grounds of judicial economy the Court declines to wade into those waters a third time to weigh the parties' re-re-briefing of the question.  That said, defendants have posited at least some record evidence that certain plaintiffs knew or should have known of the nature and causes of their injury as far back as the 1970s.  For example, as discussed *supra*, plaintiff McIntyre's admitted knowledge of the river closing because of chemical contamination in the 1970s might support an inference that he should have undertaken to examine the condition of his property at that time because of his actual awareness of offsite contaminants by Ciba and Olin.  Inasmuch as there are some facts that might raise an inference that one or more plaintiffs' FRCD occurred more than 20 years prior to the filing of the Complaint, the Court cannot categorically strike down defendants' rule of repose defense at this time.[41]

> C.     The "Failure to Prove Nuisance" Defense.

Next, the parties spar over defendants' Fourth Affirmative Defense, in which defendants contend that plaintiffs' claims are barred by the Alabama law of nuisance.

The parties' briefing reveals that this defense is not properly couched as an affirmative defense at all.  A defense predicated on a plaintiff's inability to prove the elements of its claim is not an affirmative defense.  *See generally In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."); *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense.").  Also, "it is well established that the party asserting an affirmative defense usually has the burden of proving it."  *Rawson*, 846 F.2d at 1349 (internal quotations and

---

[41]     Where CERCLA's FRCD applies, "the FRCD preempt[s] state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of the [property] injury was, or reasonably should have been, known to be the hazardous substance."  *Freier*, 303 F.3d at 196; *see also O'Connor*, 311 F.3d at 1146 ("§ 9658 preempts [state]'s commencement date if that date is earlier than the" FRCD).  Under Alabama's rule of repose, the 20-year period begins running on the date of the complained-on wrongdoing; however, pursuant to the Court's rulings concerning the applicability of § 9658 of CERCLA, that state-law commencement date is supplanted by the FRCD's discovery rule, such that Ciba's rule of repose defense turns on whether plaintiffs knew or should have known of the nature and cause of their injuries more than 20 years before they filed the Complaint.  That question is for the jury to decide in this case.

citation omitted).

The gravamen of the Fourth Affirmative Defense is that plaintiffs are unable to prove the "negligent or improper operation" of the Ciba plant, as required to establish a nuisance claim under Alabama Code § 6-5-127(a).  In order for plaintiffs to prevail on their nuisance claim, they must prove that "a nuisance result[ed] from the negligent or improper operation of [Ciba's] plant," so as to overcome the statutory bar on nuisance actions against an industrial plant that has been in operation for more than one year during which it has not been found by a court of competent jurisdiction to be a nuisance.  *See* Ala. Code § 6-5-127(a).  This "negligent or improper operation" requirement is an element of plaintiffs' nuisance claim that they must prove at trial, and is not properly categorized as an affirmative defense.  *See St. Louis-San Francisco Ry. Co. v. Wade*, 607 F.2d 126, 131-32 (5th Cir. 1979) (district court erred in submitting Alabama nuisance exemption for industrial plants to the jury as an affirmative defense, rather than as a separate claim for negligent nuisance); *see generally Courtaulds Fibers, Inc. v. Long*, 779 So.2d 198, 201 (Ala. 2000) (nuisance claim requires plaintiff to present substantial evidence at trial of negligent or improper operation of plant).

Similarly, defendants attempt through their Fourth Affirmative Defense to challenge plaintiffs' ability to meet the criteria for bringing a public nuisance claim, as set forth on pages 19 and 20 of the joint proposed Pretrial Order.  In particular, defendants dispute whether plaintiffs can show the requisite "special damage" to assert a claim of public nuisance.  *See, e.g., Russell Corp. v. Sullivan*, 790 So.2d 940, 951 (Ala. 2001) (public nuisance claim requires showing of "special damage" different in kind and degree from that suffered by public in general).  Again, the "special damage" requirement is an element of plaintiffs' claims, and not an affirmative defense.

Because the Fourth Affirmative Defense is predicated on Ciba arguments that are not properly classified as affirmative defenses, plaintiffs' Motion for Summary Judgment is **granted** as to that affirmative defense; however, nothing herein will in any way preclude or restrict defendants from contesting plaintiffs' ability to prove all of the legally required elements of their nuisance claim at trial.

### D.    The Industry Practice/State of the Art Defenses.

Plaintiffs also seek summary judgment on defendants' trio of affirmative defenses

(Defenses # 6, 14, and 43) relating to compliance with industry standards and the state of the art. The sole asserted basis of plaintiffs' motion on this point is a conclusory statement that "Defendants were not in compliance with common industry practice in effect at the time the acts and/or omissions made the basis of this lawsuit occurred." (Doc. 503, at 6.) Inasmuch as plaintiffs neither elaborate on this glittering generality nor submit record excerpts in support of this sweeping proclamation, plaintiffs would apparently have defendants and this Court guess how plaintiffs contend defendants were not in compliance, and what record evidence supports such a contention. On this nonexistent showing, it is abundantly clear that plaintiffs have failed to carry their "initial burden of demonstrating to the court that no genuine issue of material fact exists." *O'Ferrell*, 253 F.3d at 1265; *see also Imaging Business Machines, LLC v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006) ("a motion for summary judgment requires the moving party to show the absence of any genuine issues of fact").[42] Accordingly, plaintiffs' Motion for Summary Judgment is **denied** as to Affirmative Defenses # 6, 14 and 43.

### E.     The OSHA Standard Defense.

Next, plaintiffs request summary judgment on defendants' Tenth Affirmative Defense, which reads as follows: "Plaintiffs' claims are preempted or barred in whole or in part by the O.S.H.A. Hazard Communication Standard, 29 C.F.R. '1910.1200(a)(2)." (Doc. 412, at 21.) The subject regulation requires employers "to provide information to their employees about the

---

[42]     Even if plaintiffs had satisfied their initial burden, which they have not, defendants have successfully rebutted same by pointing to record evidence tending to support their contention that they were in compliance with industry practice at the time of the acts complained of. For example, defendants identify the expert report of Thomas Devine, which tends to show that Ciba complied with industry practice / state of the art with regard to remediation efforts. In particular, Devine opines that "[t]he Superfund process with its intricate overlapping multi-agency reviews was followed" and that the "extensive safeguards built into the remedial process ... were met ... to prevent ... inadequate site characterization and inappropriate remedies." (Doc. 528, Exh. J, at 1-2.) While Devine's report does not address "state of the art" as squarely as one might like, it certainly would support an inference of compliance that suffices to vault these affirmative defenses past summary judgment, even had plaintiffs postured their summary judgment motion correctly. In derogation of the plain text of Devine's report, plaintiffs decry in conclusory terms in their reply brief what they characterize as "no competent evidence" to support defendants' "claim that they complied will [*sic*] all applicable laws." (Doc. 535, at 5.) Defendants have the better argument for Rule 56 purposes.

hazardous chemicals to which they are exposed, by means of a hazard communication program, labels and other forms of warning, material safety data sheets, and information and training."  29 C.F.R. § 1910.1200(b)(1).  On its face, this regulation has no conceivable nexus to the issues joined for trial herein.  Plaintiffs are not attempting to bring state-law claims asserting that Ciba furnished insufficient information to its employees about hazardous chemical exposures. Apparently recognizing the superfluous nature of this defense, Ciba makes no response to this aspect of the motion for summary judgment.  Inasmuch as nothing in the vast materials reviewed by this Court suggests that the OSHA Hazard Communication Standard bears in any way on plaintiffs' claims against Ciba herein, and defendants have failed to argue otherwise, the Motion for Summary Judgment is **granted** with respect to the Tenth Affirmative Defense.

   *F.*  *The Accord and Satisfaction Defense.*

   Plaintiffs also ask the Court to grant summary judgment with respect to the Eleventh Affirmative Defense, which states, "Plaintiffs' claims are barred in whole or in part by the doctrine of accord and satisfaction."  (Doc. 412, at 21.)  As with the OSHA affirmative defense, plaintiffs' argument is not that there is insufficient evidence to support this defense, but is rather that the defense is inapplicable to the claims presented here.  So postured, this argument satisfies plaintiffs' initial burden because it does not turn on the presence or absence of any record facts.

   In response, Ciba states in the vaguest of terms that one plaintiff, Greer, "received a check in the *LeBauve* [*sic*] settlement," and that "[i]t is likely that the other four plaintiffs did as well."  (Doc. 528, at 23.)  But defendants fail to explain in even broad outlines how Greer's acceptance of settlement proceeds from Olin Corporation (who is not a party herein) in another lawsuit relating to other contaminants could constitute an accord and satisfaction as to Greer's claims against Ciba.  Under Alabama law, an accord and satisfaction is "an agreement reached between competent parties regarding payment of a debt the amount of which is in dispute." *Newson v. Protective Industrial Ins. Co. of Alabama*, 890 So.2d 81, 87 (Ala. 2003).  How does an agreement between Greer and Olin for payment of a debt owed by Olin amount to an accord and satisfaction of Greer's claims against Ciba?  Ciba offers no legal basis for this assertion, but would have the Court simply accept on faith that such is the case.  That is not sufficient to survive summary judgment scrutiny.  The same applies to defendants' conclusory, enigmatic statement that "there are a number of contested factual issues to support Defendants' defense of

accord and satisfaction by virtue of the settlement involving Galecron in 1999, which may be applicable to this case." (Doc. 528, at 23.)  Defendants do not reveal what those "contested factual issues" are.  They do not point to any evidence that plaintiffs were parties to the Galecron settlement.  And they do not offer any explanation for how that settlement could possibly satisfy Alabama legal requirements for an accord and satisfaction of the claims at issue here.  Summary judgment is not a time to play one's cards close to the vest.  If Ciba believes that accord and satisfaction is properly raised as an affirmative defense at trial, then now is the time to explain why and how, and to identify the evidence on which the claim rests.[43]  Ciba has elected to deal in cryptic generalities instead.

The Court's determination that summary judgment is warranted on the Eleventh Affirmative Defense is bolstered by the lack of any reference to accord and satisfaction or facts relating to same anywhere in the joint proposed Pretrial Order (doc. 534).  This Court's Standing Order Governing Final Pretrial Conference provides that all legal claims and defenses to be tried are to be set forth in the "Triable Claims" section of the document, and that such document "shall constitute the final statement of the claims to be litigated, shall govern the conduct of the trial, and shall constitute the basis for any relief afforded by the Court."  (Doc. 395, at attachment, at 3-5.)  Having neglected to mention accord and satisfaction, the legal elements of same, or the supporting facts in the pretrial document, Ciba has failed to join the Eleventh Affirmative Defense as a triable issue.

Finally, the Court notes that this is a complex case.  The parties anticipate a lengthy trial lasting well over a week.  It behooves the parties and the Court to streamline this trial by stripping away unnecessary complexities that do not represent *bona fide* issues in dispute in this

---

[43]        In that regard, the undersigned cannot adopt defendants' position that plaintiffs' summary judgment motion as to the accord and satisfaction defense is "entirely premature." (Doc. 528, at 23.)  Plaintiffs filed their Motion on May 30, 2007, some 45 months after the Complaint was filed, after the close of both class and merits discovery, and on the very deadline established by the Magistrate Judge for filing dispositive motions.  (*See* doc. 495.)  There was nothing "premature" about plaintiffs' motion.  Having had nearly four years to develop evidence to support an "accord and satisfaction" defense, and having failed to do so, defendants cannot now stall for more time at the expense of cluttering the trial with unproven, unsupported legal issues while defendants search for a legal and factual angle that might support that defense.

case.  The Court is confident that if defendants had any factual or legal basis for believing that accord and satisfaction was fatal to plaintiffs' claims, they would have presented that issue long ago, or at least would have explained it in their summary judgment briefs.  As it stands, all appearances are that accord and satisfaction is simply a bit of needless clutter, an unhelpful complication that defendants wish to keep in the mix at trial "just in case" the evidence should go in a particular way, and despite the fact they have apparently developed no evidence during the multi-year discovery periods of this action to support that defense.  This is precisely why the Rule 56 mechanism exists, to afford courts and litigants a tool with which to sweep away detritus that the parties have no legitimate basis for wasting precious trial time in litigating.

For all of the foregoing reasons, the Motion for Summary Judgment is **granted** with respect to defendants' affirmative defense sounding in accord and satisfaction.

> **G.**    ***The Harmless Chemical Defense.***

Defendants' Twenty-Third Affirmative Defense reads as follows: "Any alleged contamination to Plaintiffs' property arising from Defendants' conduct involves compounds that are harmless, non-toxic, and incapable of causing actionable property damage."  (Doc. 412, at 24.)  It does not appear from the materials before the Court that defendants intend to argue to the jury that DDT (which, along with its metabolites, is the only compound at issue in this litigation, as identified in the joint proposed Pretrial Order) is a harmless chemical that is incapable of causing property damage.  Rather, in their opposition brief, defendants explain that their position that the <u>concentrations</u> of DDT found at plaintiffs' property are insufficient to create more than a *de minimis* risk of harm.  (Doc. 528, at 21-22.)  This is a markedly different argument from that set forth in the Twenty-Third Affirmative Defense.  To say that the quantity of DDT found on plaintiffs' property damage is insufficient to cause harm or property damage is nothing at all like saying that DDT in general is a harmless substance that is incapable of causing property damage.  Defendants' Twenty-Third Affirmative Defense states the latter, not the former.  Inasmuch as defendants have failed to come forward with any evidence that DDT is a harmless chemical that can never reduce property values, and inasmuch as they have not joined that issue in the joint proposed Pretrial Order designating the triable claims, the Motion for Summary Judgment is **granted** as to the Twenty-Third Affirmative Defense.  That said, nothing herein forbids or impairs defendants' ability to argue at trial that plaintiffs cannot prove injury from any DDT

contamination by Ciba because the concentrations found on their property are too small to matter.[44]

### H.    The Res Judicata / Collateral Estoppel Defense.

Finally, plaintiffs' Motion for Summary Judgment challenges defendants' *res judicata* and collateral estoppel defenses set forth as the Thirtieth Affirmative Defense, which reads as follows: "The causes of action set forth herein are barred in whole or in part under the doctrines of *res judicata* and/or collateral estoppel arising out of previously filed class action proceedings relating to alleged offsite contamination caused by these Defendants and other entities not parties to this proceeding." (Doc. 412, at 26.) The gravamen of plaintiffs' motion is that *res judicata* and collateral estoppel have no application because there has been no final judgment on the merits in other litigation as to any pending legal issue in this case.

Defendants respond by referencing *LaBauve v. Olin Corporation*, Civil Action 03-0567-WS-B, a putative class action filed by a different group of named plaintiffs against different defendants and complaining of a different type of contamination to their properties in McIntosh, Alabama. In November 2005, the undersigned entered an order in the *LaBauve* matter that

---

[44]    This argument, as presently formulated in defendants' briefs, is not an affirmative defense, but is rather an assertion that plaintiffs cannot prove the damage elements of their claims because the DDT contamination levels observed on their property levels are *de minimis*. As such, it was unnecessary for defendants to plead this defense as an affirmative defense, and they will be permitted to present arguments and evidence to the jury that the DDTr concentrations on plaintiffs' property are insufficient to pose health risks. In allowing the parties some leeway to present these matters at trial, however, the Court emphasizes that this is a property damage case, not a personal injury case. Evidence by either side concerning health risks attendant to particular concentrations of DDT on plaintiffs' property is relevant only insofar as it sheds light on the diminution in property value caused by such DDT concentrations. Therefore, the Court expects that health-based evidence presented by either side will be directly tied into property valuations, failing which such evidence will be excluded pursuant to Rule 402, Fed.R.Evid. The Court also cautions the parties not to hijack the property damage issues joined in this action and sidetrack this trial with a prolonged exploration of the ancillary question of whether the DDT found on plaintiffs' properties constitutes a human health risk. Again, this case is about property damage, not personal injury. While the risk of personal injury by DDT contamination on a plaintiff's property may be linked to the degree of property devaluation, that nexus is not so compelling as to render such evidence impervious to Rule 403 objections, particularly if such evidence is offered in a manner that threatens to consume extensive trial time disproportionate to its limited evidentiary value.

denied class certification. *See LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005). That case subsequently settled out of court. Defendants now reason that their Thirtieth Affirmative Defense should survive because "[i]t is entirely possible that issues relating to this case may have been litigated at the certification hearing or the trial in the *LaBauve* case." (Doc. 528, at 23.) This argument fails on at least four levels. First, contrary to defendants' assertions, there was no trial in the *LaBauve* case. Second, none of the plaintiffs in this case were named plaintiffs in *LaBauve*, the Court entered no final judgments on the merits in that case, and the Rule 23 issues decided in *LaBauve* do not constitute triable issues here, so it is difficult to imagine how either doctrine could apply. *See, e.g., Ex parte Jefferson County*, 656 So.2d 382, 384-85 (Ala.1995) (party invoking *res judicata* must prove all of the following: "(1) a prior judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) substantially the same parties involved in the prior case are involved in the current case; and (4) the same cause of action presented in both suits."); *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1293 (11th Cir. 2003) ("To successfully invoke collateral estoppel, a party must demonstrate that: (1) the issue at stake in a pending action is identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.").

Third, defendants' vague suggestion that it is "entirely possible that issues relating to this case may have been litigated" in the certification proceedings in *LaBauve* is inadequate. Ciba's counsel attended the class certification hearing in *LaBauve* in April 2005 and therefore has direct knowledge of precisely what was litigated in those proceedings. Ciba has had nearly two years to study the *LaBauve* class certification order to identify any issues decided there that might trigger *res judicata* or collateral estoppel. Yet, despite all of that, Ciba's summary judgment response does not identify a single issue as to which *res judicata* or collateral estoppel might apply, instead advocating the same "wait-and-see" approach it championed as to the accord and satisfaction defense and complaining that plaintiffs' motion is "premature." Defendants' desired approach is improper. If it has any legal or factual basis for invoking *res judicata* or collateral estoppel, now is the time to step forward. Despite having had years to study these issues and

prepare for trial, Ciba has failed to identify any aspect of the *LaBauve* class certification order that might constitute *res judicata* or collateral estoppel with respect to claims brought by these five plaintiffs. The Thirtieth Affirmative Defense will not be allowed to clutter and complicate the trial on the basis of such a paltry showing of its applicability.

Fourth, defendants failed to mention *res judicata* or collateral estoppel in the joint proposed Pretrial Order, so those defenses have not been joined as triable claims in the document that governs the trial of these proceedings.

Accordingly, plaintiffs' Motion is **granted** with respect to the Thirtieth Affirmative Defense.

## VI. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.  The first, erroneously filed iteration of Defendants' Motion to Strike (doc. 538) is **moot** because it was superseded by its successor.

2.  The second iteration of Defendants' Motion to Strike (doc. 539) is **denied**.

3.  Defendants' Motion for Summary Judgment (doc. 502) on damages issues is **denied**.

4.  Defendants' Motion for Partial Summary Judgment on Fraud, Misrepresentation and RICO Claims (doc. 405) is **moot** as to the misrepresentation and unjust enrichment claims, which either were not pleaded or have been abandoned in the Pretrial Order, but is otherwise **granted**. The fraud and RICO causes of action brought by plaintiffs Fisher, Reed, Byrd and McIntyre are **dismissed with prejudice**. Defendants did not move for summary judgment on plaintiff Sharon Greer's fraud and RICO claims; therefore, those claims remain pending and will proceed to trial.

5.  The affidavit of plaintiff McIntyre dated December 14, 2006 (doc. 420, Exh. V) is **stricken** pursuant to the sham affidavit rule.

6.  Defendants' Motion for Summary Judgment on All Claims of William Ronald McIntyre (doc. 406) is **denied**.

7.  Plaintiffs' Motion for Partial Summary Judgment (doc. 503) is **granted in part**,

and **denied in part**.  The Motion is **granted** with respect to the Fourth Affirmative Defense (plaintiffs' failure to prove nuisance), the Tenth Affirmative Defense (OSHA preemption), the Eleventh Affirmative Defense (accord and satisfaction), the Twenty-Third Affirmative Defense (harmless compounds incapable of causing property damage), and the Thirtieth Affirmative Defense (*res judicata* / collateral estoppel).  Summary judgment is granted in plaintiffs' favor as to each of those affirmative defenses.  In all other respects, the Motion is **denied**.

8.      This action remains set for Final Pretrial Conference on **October 22, 2007** at **2:00 p.m.**, with trial set for **November 7, 2007**.

DONE and ORDERED this 11th day of October, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

-46-